**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**DARCY A. KORNELL, individually and as parent and natural guardian of Quinten Matthew Zink, a minor,**

**Plaintiff,**

**v.**

**HARDIN OLSON, M.D.,**

**Defendant.**

**Civil No. 00-1836 (JMR/SRN)**

**ORDER**

---

Thomas A. Foster, Esq., and Sheila A. Bjorkland, Esq., on behalf of Plaintiff Darcy Kornell, individually and as parent and natural guardian of Quinten Matthew Zink, a minor.

Terence J. O'Loughlin, Esq., and Carolin J. Nearing, Esq., on behalf of Defendant Hardin Olson, M.D.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came on for hearing before the undersigned Magistrate Judge of District Court on May 8, 2001, on a motion by the Plaintiff Darcy Kornell, individually and as parent and natural guardian of Quinten Matthew Zink, a minor, to amend her pleadings. The Plaintiff seeks to include a cause of action for negligent non-disclosure pursuant to Fed. R.

JUN 08 2001
FILED
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Civ. P. 15(a), and also to include a claim for punitive damages pursuant to Minn. Stat. §§ 549.191 and 549.20.

Defendant Olson does not oppose the portion of the Plaintiff's motion seeking leave to amend her Complaint to add a cause of action for negligent non-disclosure. Accordingly, this part of the Plaintiff's motion to amend the pleadings is granted.

Defendant Olson does oppose the Plaintiff's motion to amend the Complaint to include a claim for punitive damages, asserting that the Plaintiff has failed to establish prima facie evidence of "deliberate disregard for the rights or safety of others."

**A. Factual Background**

This case involves a medical malpractice claim[1] by Plaintiffs against Defendant Hardin Olson, M.D. Dr. Olson, an obstetrician and gynecologist, provided obstetrical care to Plaintiff Darcy Kornell during her pregnancy, labor and the delivery of her son Quinten Zink in October 1997. See Complaint attached as Exhibit A to the Affidavit of Carolin J. Nearing (Nearing Aff.). Dr. Olson is now retired, but at the time relevant to this lawsuit he was an obstetrician and gynecologist on staff at Fairview University

---

[1] The Court's jurisdiction over this controversy is based upon diversity of citizenship under 28 U.S.C. § 1332, in that the Plaintiffs are residents of the State of Florida, and the Defendant is a resident of the State of Minnesota. See Complaint, Paragraphs 1-3.

Hospital, and was associated with the University physicians' group in clinical practice. See Excerpts of the deposition of Hardin Olson, M.D., Olson depo. at 5, 9, attached as Exhibit B to the Nearing Affidavit.

On Fridays, as part of his clinical practice, Dr. Olson saw patients at the Palen Clinic. Olson depo. At 10, 42, 51. During a pre-natal clinic visit on Friday October 3, 1997, Ms. Kornell pointed out to Dr. Olson a 1.5 cm. multi-vesicular lesion on the medial gluteal region of her upper right thigh, approximately 4-5 cm. from her vulva, and not on her genitals. Id. at 44-45, 51, 54. Ms. Kornell noted that the lesion had not been present previously (id.), and Dr. Olson thought it was probably herpes zoster, a chicken pox virus (id. at 45-46). Dr. Olson did not, however, rule out the possibility that the lesion could be a recurrent (not primary) herpes simplex virus type 2 (HSV 2) infection. Id. at 45-49.

Dr. Olson obtained a culture in order to identify the lesion. Id. at 49-50. In addition, Dr. Olson prescribed an antiviral medication, Zovirax, which covered both herpes zoster and HSV 2. Dr. Olson instructed Ms. Kornell to report for a repeat ultrasound on Monday October 6th due to his concern about the fetus' intra-uterine growth retardation (IUGR). See Excerpts of the deposition of Darcy Kornell, at 33-40, attached as Exhibit C to the Nearing Aff. The culture was sent to an outside laboratory and Dr. Olson anticipated that the results would be returned to the Palen Clinic in four to five

days. Olson depo. at 50. Because Dr. Olson was only at the clinic once a week on Fridays, it was customary for him to view lab results on Fridays and, in this case, he expected to see the culture results on Friday October 10, 1997. Id. at 52. It was not routine for the Palen Clinic to contact Dr. Olson with results of lab tests between his Friday visits to the clinic. Id. at 52, 53.

On Monday October 6, 1997, at approximately 1530 hours, Dr. Olson admitted Ms. Kornell to Fairview University Hospital for induction of labor and delivery. See Fairview Obstetric Admission Database, p. 1, attached as Exhibit D to the Nearing Aff. Dr. Olson was concerned about the well-being of the fetus due to IUGR, a non-reassuring non-stress test of the fetal heart rate, and Ms. Kornell's developing pre-eclampsia. Olson depo at 36-44. Quinten Zink was delivered vaginally at 2335 hours by Dr. Olson . Fairvicw Obstetric Admission Database, p. 7.

Dr. Olson testified that, at the time of Ms. Kornell's labor and delivery on Monday October 6th, he completely forgot about the lesion he had seen and cultured for lab analysis on Friday October 3rd. Olson depo. at 69-71. He also testified that if he had not forgotten seeing the lesion, he would have recommended covering the lesion with an occlusive dressing and then delivering the baby vaginally. Id. at 50, 70. This is the method of delivery recommended by the American College of Obstetricians and Gynecologists (ACOG) for patients with recurrent HSV non-genital lesions. See ACOG

Practice Bulletin, p. 6, attached as Exhibit E to the Nearing Affidavit. Dr. Olson also testified that, had he not forgotten seeing the lesion, he would have conducted an informed consent discussion with Ms. Kornell about the risks and benefits of the alternatives of vaginal delivery with an occlusive dressing and cesarean delivery. Olson depo. at 86.

The lab report regarding the culture of Ms. Kornell's lesion was dated October 6, 1997, at 3:16 p.m. Id. at 59. No one involved in this lawsuit knows whether the lab report had been received by the Palen Clinic prior to Ms. Kornell's delivery on October 6th. Id. at 59, 72-74.

On October 10, 1997, four days after he was born, baby Quinten developed vesicular lesions. Olson depo. at 71, 72. It was not until after Quinten developed these lesions that the neonatalogists caring for Quinten learned that the culture of Ms. Kornell's lesion was positive for HSV 2. Id. at 71. Dr. Olson testified that he does not recall whether he was aware of the results of Ms. Kornell's culture prior to the time Quentin developed lesions. Olson depo. at 71, 72.

**B. Discussion**

Pursuant to Minn. Stat. §§ 549.191 and 549.20, the Plaintiff moves for an order granting her leave to amend the Complaint to include a claim for punitive damages. Plaintiff argues that the record before this Court clearly and convincingly demonstrates that, by withholding the positive results of Ms.

Kornell's culture from not only Ms. Kornell but also from the medical staff caring for Quentin Zink, Dr. Olson demonstrated a deliberate indifference to their rights and safety. The Plaintiff asserts that a defendant has acted with "deliberate disregard" for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others, and deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others. Minn. Stat. § 549.20 subd. 1(b). The Plaintiff further contends that, by his own admission, Dr. Olson learned that Darcy Kornell was positive for HSV2 and that her infant son had been exposed, before Quentin developed herpetic skin lesions, citing to Dr. Olson's deposition testimony at 70-72. The Plaintiff submits that, armed with this knowledge, Dr. Olson did not tell Ms. Kornell that she was HSV2 positive or that her baby had been exposed during the vaginal delivery, nor did Dr. Olson share this information with Quentin's neonatalogists. Id. The Plaintiff argues that instead, Dr. Olson kept this information to himself, despite his testimony that he knew exposure to HSV2 during delivery could wield grave consequences to the infant, including central nervous system involvement. Olson depo. at 82-86.

The Plaintiff asserts that the prevailing standard of care required Dr. Olson to inform not only his patient that she was positive for HSV2, but

that he inform her baby's physicians that the baby had been exposed. See Supplemental Expert Declaration of Athi Narayan, M.D. Had they been so informed, the generally accepted standards of care dictate that baby Quentin's physicians would have placed him on prophylactic anti-viral medication immediately in order to mitigate the consequences of the infection -- most particularly in the case of the central nervous system complications. Id. Plaintiff's expert will testify that it is probable that increased harm to Quentin occurred because early prophylactic anti-viral medication was not utilized. Id.

In sum, the Plaintiff argues that Dr. Olson acted intentionally, willfully and deliberately when he withheld from Darcy Kornell and Quentin Zink's physicians the information that Ms. Kornell was positive for HSV2. Plaintiff argues that Dr. Olson withheld this information despite knowing that Quentin had been exposed during his vaginal delivery and despite knowing the grave consequences of such exposure to an infant. The Plaintiff contends that this evidence alone is clear and convincing evidence that Dr. Olson acted with deliberate disregard for either Darcy Kornell's rights or her infant son's safety, and that this evidence is sufficient to grant Plaintiff's motion to amend her Complaint to include a claim for punitive damages.

Defendant Olson opposes this motion on the grounds that the Plaintiff has failed to produce prima facie evidence that Dr. Olson acted with deliberate disregard for the rights or safety of Darcy Kornell and/or Quentin

Zink. Therefore, Dr. Olson asserts that, absent clear and convincing proof of the threshold level of culpability, a claim for punitive damages cannot be sustained.

The pleading of punitive damages in cases involving Minnesota state law claims in federal court is generally governed by the pleading requirements of Minn. Stat. §§ 549.191 and 549.20 (1994). Ulrich v. City of Crosby, 848 F. Supp. 861, 867 n. 5 (D. Minn. 1994) (Erickson, M.J.); Zeelan Industries, Inc. v. de Zeeuw, 706 F. Supp. 702, 705 (D. Minn. 1989) (MacLaughlin, J.); Kuehn v. Shelcore, Inc., 686 F. Supp. 233, 235 (D. Minn. 1988) (Devitt, J.); Fournier v. Marigold Foods, Inc., 678 F. Supp. 1420, 1422 (D. Minn. 1988). Nevertheless, exceptions to this rule exist. See e.g., Daines v. City of Mankato, 754 F. Supp. 681, 704 (D. Minn. 1991) (Renner, J.) (Minn. Stat. § 363.071, subd. 2, of the Minnesota Human Rights Act does not incorporate Minn. Stat. § 549.191) and Zawels v. Edutronics, Inc., 520 N.W.2d 520, 524 (Minn. Ct. App. 1994) (Requirements of Minn. Stat. §§ 549.191-549.20 do not apply to exemplary damages awarded in a misappropriation of trade secrets action under Minn. Stat. § 325C.03(b), even if the terms "exemplary damages" and "punitive damages" are used interchangeably). In all instances in which Minn. Stat. § 549.191 applies, a plaintiff may not assert a punitive damages claim in the complaint in the first instance, but rather must seek leave of court to amend the pleading pursuant to that section.

Under Minn. Stat. § 549.191, a motion for leave to amend a complaint to add a claim for punitive damages must set forth prima facie evidence in support of the motion, must allege the "applicable legal basis under section 549.20 or other law for awarding punitive damages in the action," and must be supported by one or more affidavits showing the factual basis for the claim. The "applicable legal basis" reads as follows:

> Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

Minn. Stat. § 549.20, subd. 1(a).

At the amendment stage, the supporting affidavits provided by the plaintiff must present a prima facie showing of clear and convincing evidence that the acts of the defendant exhibit a deliberate disregard for the rights or safety of others. Swanlund v. Shimano Ind. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990). Prima facie evidence is "[e]vidence which, if unexplained or uncontradicted, is sufficient to sustain a judgment in favor of the issue which it supports, but which may be contradicted by other evidence." Black's Law Dictionary 1190 (6th ed. 1990); McKenzie v. Northern States Power Co., 440 N.W.2d 183, 184 (Minn. Ct. App. 1989) ("prima facie evidence is that evidence which, if unrebutted, would support a judgment in that party's favor"); Swanlund, 459 N.W.2d at 154. Under the prima facie standard, "the Court makes no credibility rulings, nor does the Court consider any challenge,

by cross-examination or otherwise, to the Plaintiff's proof." Ulrich, 848 F. Supp. at 867.

Minn. Stat. § 549.20, subd. 1(b) states that:

> A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:
>
> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or
>
> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

See also Mrozka v. Archdiocese of St. Paul & Minneapolis, 482 N.W.2d 806, 812 (Minn. Ct. App. 1992) ("willful indifference" standard)[2]; Kay v. Peter Motor Co., Inc., 483 N.W.2d 481, 485 (Minn. Ct. App. 1992) ("willful indifference" standard). Under the statutory scheme, a plaintiff's evidence must allow the Court

> to conclude that it is highly probable that the defendant acted with deliberate disregard for (rights) (safety) of others. Put another way, the evidence must produce in [the Court's] mind[] a firm belief or conviction that the defendant acted with deliberate disregard for (rights) (safety) of others.

---

[2] In 1990 the Minnesota legislature amended Minn. Stat. Section 549.20 by replacing the phrase "willfull indifference" with "deliberate disregard". This substitution became effective May 4, 1990, and applies to causes of action arising after that date. Olson v. Snap Products, 29 F. Supp.2d 1027,1035 (D.Minn. 1998).

4 Minnesota Practice: Civil Jury Instruction Guide JIG 195 (West Supp. 1996); see also Ulrich, 848 F. Supp. at 868 (citing Weber v. Anderson, 269 N.W.2d 892, 895 (Minn. 1978)); Becker v. Alloy Hardfacing & Eng'g Co., 401 N.W.2d 655, 658 (Minn. 1987) (Amdahl, C.J.); In re Estate of Lobe, 348 N.W.2d 413, 414 (Minn. Ct. App. 1984).

Finally, the Court "must view the evidence of [deliberate disregard] presented through the prism of substantive evidentiary burden," i.e., admissible, clear and convincing evidence. Swanlund, 459 N.W.2d at 154.

When a plaintiff moves to add a punitive damages claim, the Court is essentially required "to direct a portion of the verdict against the plaintiff if the evidence of [deliberate disregard] is insufficient." Swanlund, 459 N.W.2d at 155. Thus, as in ruling on a motion for directed verdict,[3] the Court must view the evidence most favorably to the party against whom the motion is made, and give that party the benefit of all reasonable inferences from the evidence. See Abbett v. County of St. Louis, 474 N.W.2d 431, 433 (Minn. Ct. App. 1991).

In support of her motion, the Plaintiff has submitted the Affidavit of Shelia A. Bjorkland with selected pages of the deposition testimony of Hardin Olson, M.D., and the Supplemental Expert Declaration of Athi Narayan, M.D., attached; as well as the Supplemental Affidavit of Shelia A. Bjorkland with two

---

[3] Now denominated in the Federal Rules of Civil Procedure as a motion for the entry of judgment as a matter of law. See Fed. R. Civ. P. 50(a).

pages of the Fairview Obstetric Admission Database attached. However, a careful review of these Affidavits and the attached exhibits does not, at this time, support a finding of a prima facie showing of clear and convincing evidence that Defendant Olson acted with deliberate disregard for the rights and safety of Plaintiffs Darcy Kornell and/or Quinten Zink. Compare Swanlund, 459 N.W.2d at 154.

While Dr. Olson's deposition testimony regarding the sequence of events following his acquisition of the lab results of Ms. Kornell's culture is confusing, at times contradictory, and reflects arguably negligent behavior, (see Olson depo,, Exhibit B to the Nearing Aff. at pp. 70-72), his testimony, in and of itself, does not constitute clear and convincing evidence that he deliberately disregarded the rights and safety of either Darcy Kornell or Quinten Zink. In fact, Dr. Olson ended this portion of his testimony by stating, "I'm not sure I had the information prior to the time that the – the information of the culture prior to the time that it became apparent that the baby had some lesions." Id. at 72.[4]

Moreover, at this time, the current evidence defies a finding of deliberate indifference on Dr. Olson's part. Indeed, the evidence suggests that

[4] It would be helpful to discover: 1) when Quinten Zink's neonatalogists became aware that Quinten's mother had been cultured positive for type 2 herpes; and 2) when the Palen Clinic notified Dr. Olson of the lab report. The records suggest that Quinten Zink developed lesions on Friday October 10, 1997, the day Dr. Olson returned to the Palen Clinic after Quinten's birth.

Dr. Olson was concerned about the well-being of both the mother and the baby. During the examination of Darcy Kornell on October 6, 1997, Dr. Olson was clearly concerned by the continuing indication that Ms. Kornell's fetus was suffering from intrauterine growth retardation and, that due to an increase in Ms. Kornell's blood pressure as well as the presence of proteinuria, Ms. Kornell was possibly developing preeclampsia. See Kornell depo. at 33-40 (Ex. C to the Nearing Aff.), and Olson depo. at 30-31 (Ex. B to the Nearing Aff.). Dr. Olson therefore ordered Ms. Kornell to three days of bed rest, and instructed her to report to the hospital on Monday October 6, 1997, for a repeat ultrasound and a non-stress test. Id. On October 6, 1997, Dr. Olson admitted Ms. Kornell to the hospital for induction of labor and delivery based on his ongoing concern for the well-being on the fetus due to intra-uterine growth retardation, a non-reassuring non-stress test of the fetal heart rate, and Ms. Kornell's developing preeclampsia. Id. at 36-44.

Rather than presenting a prima facie showing of clear and convincing evidence of deliberate disregard, these facts indicate a concern for the well-being of this child and mother. In light of the substantial factual showing which must be made in order to support a punitive damages amendment, the Court will deny Plaintiff's motion without prejudice at this time. In the event further discovery reveals any additional facts to support this claim, Plaintiff may renew her motion after the completion of discovery.

Based upon the above, and upon all the files, records, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1) Plaintiff's Motion to Amend the Complaint to Include a Cause of Action for Negligent Non-Disclosure (Doc. No. 9) is **GRANTED WITHOUT OPPOSITION**. The Plaintiff is given leave to file and serve an Amended Complaint which includes a cause of action for negligent non-disclosure; and

2) Plaintiff's Motion to Amend the Complaint to Include a Claim for Punitive Damages (Doc. No. 9) is **DENIED WITHOUT PREJUDICE**.

Dated: June 8, 2001.

Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge