**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Darcy A. Kornell, individually and as parent and natural guardian of Quinten Matthew Zink, a minor,**

**Plaintiffs,**

**v.**

**Hardin Olson, M.D.,**

**Defendant.**

**Civil No. 00-1836 (JMR/SRN)**

**ORDER**

---

Phillip A. Cole, Esq., on behalf of Plaintiffs.

Carolin J. Nearing, Esq. and Terence O'Laughlin, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on October 11, 2001, on Defendant's Motion to Compel (Doc. No. 20).

This Order addresses the above motion.

## I. DEFENDANT'S MOTION TO COMPEL

### A. Factual Background.

This case arises out of the care and treatment Defendant provided to Plaintiff Darcy A. Kornell during the management of her labor and the delivery of her son, Quinten Zink. The December 27, 2000 Pretrial Scheduling Order provided that full disclosure of expert testimony, required by Rule26(a)(2)(B), accompanied by the written report prepared and signed by the expert witness was to be made by June 1, 2001. Both parties then agreed to extend this deadline to June 15, 2001 for all other experts, and June 25, 2001 specifically for one of Plaintiff's

FILED OCT 24 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

experts, Dr. Luis Villar.

Prior to the deadline, Plaintiffs identified Dr. Kenneth Cross as an expert and provided Defendant with a letter from Dr. Cross, explaining that this letter contained the grounds for his opinions. On June 25, 2001, Plaintiffs served Defendant with the expert disclosure of Dr. Villar. On July 25, 2001, Plaintiffs disclosed the identities of Dr. Lawrence Burstein, Dr. Daniel Shanks, Dr. Ralph Faville, and Dr. Susan Quigley as treating physicians likely to be called to offer their opinions at trial. On July 26, 2001, Plaintiffs disclosed Dr. Sean Casey as another expert anticipated to offer his opinion at trial. Dr. Casey is also one of Quinten Zink's treating physicians.

Following disagreements between the parties concerning what disclosures were required from these doctors, Defendant brought the present motion.

**B. Expert Witnesses: Drs. Cross, Casey, and Villar.**

The Federal Rules of Civil Procedure make the following provision with respect to expert witness disclosures:

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed. R. Civ. P. 26(a)(2)(B).

The need for the current rule came about because, "the information disclosed under the former rule in answering interrogatories about the 'substance' of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness." Fed. R. Civ. P. 26(a)(2)(B) Advisory Committee's Note.

"The commentary to the amended Rule echoes the district court's stated rationale for requiring expert reports: the elimination of unfair surprise to the opposing party and the conservation of resources." Sylla-Sawdon v. Uniroyal Goddrich Tire Co., 47 F.3d 277, 284 (8th Cir. 1995).

Defendant states that Drs. Cross, Casey, and Villar have supplied vague and unclear reports which do not provide him with a reasonable opportunity to prepare for effective cross-examination, or to arrange for rebuttal testimony. Hence, Defendant states that these reports do not satisfy the Rule 26(a)(2)(B) disclosure requirements.

**1. Dr. Cross.**

With regard to Dr. Cross, Defendant states that his report is primarily conclusory statements which lack the detail and bases for his conclusions. Defendant states,

> Dr. Cross identifies abnormalities on the MRI scan of Quinten Zink's brain as "generalized brain atrophy," "leukomalacia," "periventricular calcifications," and a "possible migration abnormality." He seems to concede the "possible migration abnormality" occurred early in gestation and was unrelated to a herpes infection contracted during the vaginal delivery; but this is unclear and there is not clear description of the "possible migration abnormality" or whether be believes it is a "schizencephaly."

In essence, according to Defendant, Dr. Cross' report fails to adequately supply necessary

information in the following manner. Dr. Cross offers no indication of whether he believes the symptoms of brain atrophy, leukomalacia, and calcifications were caused by the herpes virus contracted during the vaginal delivery. However, Defendant presumes that Dr. Cross must believe this, because otherwise he would be of no use to Plaintiffs' case. Therefore, Defendant contends that Dr. Cross must explain in detail why he believes the herpes virus was the cause, in order to properly allow Defendant to prepare a response to his expected testimony. Moreover, Defendant argues that Dr. Cross was aware that Quentin Zink suffered from a migrational disorder that was caused in utero, rather than by a herpes infection sustained at birth. However, Defendant explains, Dr. Cross offers no explanation for why he concludes that infection at birth must be the cause for the generalized brain atrophy, leukomalacia, and periventricular calcifications, instead of the simpler conclusion that these symptoms and the in utero migrational disorder share the same cause. As a result, Defendant maintains that Dr. Cross' report contains no basis for one of the most significant premises in Plaintiffs' case, namely that there were multiple causes for Quentin Zink's brain injuries.

Defendant also notes that the terminology in Dr. Cross' report is misleading. Dr. Cross states in his report that the symptoms of generalized brain atrophy, leukomalacia, and brain calcifications he identified resulted from "congenital infection." Yet under standard medical usage, the term congenital refers to symptoms that are either hereditary or caused by some influence prior to birth. Defendant contends that "if Dr. Cross means what he said, then he agrees with defendant's view of the case, i.e., Quinten Zink's brain damage occurred in utero and was congenital. If Dr. Cross does not mean what he said, then his opinion needs to be clarified."

Plaintiffs respond that Dr. Cross' report is not inadequate for purposes of Rule

26(a)(2)(B). Dr. Cross, according to Plaintiffs, makes clear that he has detected atrophy, leukomalacia, and brain calcifications, that require some kind of clinical correlation. In addition, Dr. Cross detects no infectious agent from his own radiology testing. Plaintiffs explain that Dr. Cross then proceeds to conclude from the fact that the only infectious agent clinically identified in this case was herpes, that herpes was the cause of the above-mentioned brain conditions. Plaintiffs state that this report is entirely clear and is neither vague nor misleading. Moreover, Plaintiffs explain that an in utero herpes infection would not have produced the symptoms that Dr. Cross detected through his radiology testing. Instead, if there had been a skin-eye-mouth transmission of herpes in utero, it would have resulted in Quentin Zink dying in utero, rather than being born with the current symptoms. Therefore, Plaintiffs conclude that Dr. Cross did not need to address Defendant's single cause argument in his report.

With regard to the term "congenital," Plaintiffs' counsel has informed Defendant that he conferred with Dr. Cross and ascertained that Dr. Cross employed the term to mean an infection transmitted at the moment of birth. Therefore, Plaintiffs conclude that the language of Dr. Cross' report should no longer be confusing or insufficient for Defendant.

The Court grants Defendant's motion with regard to Dr. Cross.[1] The report makes clear what Dr. Cross detected from the MRI, but does not supply a sufficient basis for his conclusion that herpes was the cause of the identified symptoms. While Plaintiffs' counsel himself offers a possible explanation for Dr. Cross' conclusion, that alone is insufficient. Dr. Cross was aware

[1]The Court has recently received a letter from Plaintiffs' counsel stating that Dr. Cross has declared himself "too busy" to devote time to this matter, and that consequently he will not be testifying. If this is indeed the case, then it is unnecessary for Dr. Cross to update his report. If, however, Dr. Cross becomes once again able to participate, he will not be permitted to testify without updating his report consistent with the provisions of this Order.

that Quentin Zink suffered from at least one condition (the migrational disorder) that could not be caused by a herpes infection he sustained at the time of birth. However, he states that the only infectious agent present was herpes, and therefore the atrophy, leukomalacia, and brain calcifications must have resulted from it. Whether or not this conclusion is correct, Dr. Cross' report provides Defendant with no basis or details from which to understand Dr. Cross' conclusion. Moreover, the lack of detail leaves Defendant unable to adequately prepare to rebut Dr. Cross' report, or impeach his testimony. Therefore, the report fails to satisfy the requirements and purpose of Rule 26(a)(2)(B). As a result, Plaintiffs must direct Dr. Cross to supplement his report.

**2. Dr. Casey.**

Defendant states that Dr. Casey employed the same ambiguous terminology as Dr. Cross. Defendant explains, "[l]ike Dr. Cross' interpretation of Quentin Zink's MRI scan, Dr. Casey's impressions of this CT scan suggest that the 'calcifications' and 'migrational abnormalities' occurred early in gestation 'from the prior congenital herpes insult (emphasis added) and are thus unrelated to a herpes infection contracted during the vaginal delivery."

Plaintiffs respond that, as with Dr. Cross, Dr. Casey has since clarified the language of his report and confirmed to Defendant that he used the term congenital to refer to a herpes infection contracted at the time of birth, and not in utero.

The Court grants Defendant's motion with regard to Dr. Casey's terminology. If Dr. Casey intends for the term congenital to refer to a herpes infection contracted at the time of birth, he himself must include that point of clarification in his report, rather than relying on Plaintiffs' counsel's representation to Defendant.

3. **Dr. Villar.**

Defendant states that Dr. Villar's report also does not satisfy the Rule 26(a)(2)(B) requirements, because it consists of three paragraphs of generally conclusory statements that lack any basis or detail. Defendant explains that "Dr. Villar states, 'the CT scans and MRI's of Quinten's brain show calcification in the white matter that are consistent of a viral encephalitis.' He then opines, 'there is no evidence of other viral infection. . .as a cause for these calcifications,' and thus simply concludes the calcifications 'were caused by [Quinten's] neonatal HSV-2 infection."

The inadequacy of this report, Defendant explains, is that Dr. Villar supplies no supporting data for his arguments. Dr. Villar does not provide evidence to explain why he concludes that there are no other possible causes of the symptoms. In addition, Dr. Villar does not supply any basis for his conclusion that Quinten Zink's herpes progressed to the central nervous system, thus injuring his brain.

To emphasize his point, Defendant contrasts Dr. Villar's report with another of Plaintiffs' experts, Dr. Kimberland, who reached the opposite conclusion from Dr. Villar. Dr. Kimberland, Defendant explains, "cited extensive laboratory data, clinical data and authoritative published herpes studies to support his opinion." Whereas Dr. Villar, offered no such supporting authority or laboratory data.

Plaintiffs respond that Dr. Villar's report is also entirely consistent, and contains no unsupported leap to the conclusion that herpes contracted at birth was the cause of Quinten Zink's brain injury. In addition, Plaintiffs state, the report is neither vague nor difficult to understand. Plaintiffs explain Dr. Villar's method as follows:

> He has "reviewed the child's medical record from birth to the present." He takes note of the calcifications proved by CT and MRI. He observes the absence of in utero infection and the presence of an active lesion at the time of birth. He observes that 90% of HSV II infections are prenatally acquired. He notes the absence of evidence for any other causative agent. He identifies the brain injury as a substantial cause of Quinten's neurological deficits which have been extensively documented.

Plaintiffs conclude that while Dr. Villar's report is brief, it is not insufficient as a 26(a)(2)(B) disclosure.

The Court grants Defendant's motion with regard to Dr. Villar. As with Dr. Cross, Dr. Villar's report does not supply adequate detail for his conclusion that herpes contracted at birth was the cause of Quinten Zink's neurological deficits. Further, while Dr. Villar was also aware that Quinten Zink suffered from a migrational disorder contracted in utero, well before birth, his report lacks sufficient detail as to why he discounts the possibility that the neurological deficits he detected share a common cause with the symptoms contracted in utero. If Plaintiffs intend to make use of the conclusions these two doctors draw, they will have to supply more significant disclosures that detail the bases. Otherwise, their testimony will be limited to the basic results of their radiology procedures, and they will not be permitted to opine on subjects such as causation.

C. **Treating Physicians: Drs. Casey, Shanks, Burstein, and Cross.**

The Advisory Committee's Note to Rule 26A makes the following provision regarding treating physicians:

> The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written

report.

Defendant states that although Plaintiffs list Drs. Casey, Shanks, and Burstein only as treating physicians and not as expert witnesses, Plaintiffs intend for these doctors to draw conclusions concerning issues beyond the facts known to them through their treatment of Quinten Zink. Therefore, Defendant states, these doctors must be treated as expert witnesses, and accordingly must also supply disclosures pursuant to Rule 26(a)(2)(B). Defendant maintains that the exception for treating physicians exists because treating physicians normally prepare a record of their treatment, and disclosure is achieved through this record, thus making a 26(a)(2)(B) disclosure unnecessary. In cases where a treating physician wishes to testify to matters beyond the record he or she prepared, however, Defendant contends that the basis for the exception disappears. Defendant cites Thomas v. Consolidated Rail Corp., 169 F.R.D. 1 (D. Mass. 1996) as standing for the proposition that "when a treating physician formulates opinions on prognosis, causation or standard of care, the physician goes beyond what was necessary to provide appropriate care and steps into the shoes of a retained expert."

Defendant explains that these doctors' own reports do not contain many of the facts they rely upon for their conclusions as to the cause of Quentin Zink's brain injury. Defendant states that Drs. Shanks and Burstein, Quentin Zink's former and present neurologists, indicate they will offer opinions concerning the cause of Quinten Zink's neurological deficits, rather than simply identifying them. Defendant states that these doctors' own reports, however, do not concern information relevant to causation. Instead, Defendant states, these doctors are relying on the medical reports and opinions of other physicians to comment on causation. Defendant also contends that if facts concerning causation had been important to these physicians for purposes of

their treatment of Quinten Zink, they would have included those facts in their own reports. Because they did not, Defendant concludes, inquiries into causation must not have been relevant to their treatment. Therefore, Defendant states that the treating physicians are not restricting their testimony to the limited scope that qualifies for the exception to the 26(a)(2)(B) disclosure requirement. As a result, Defendant requests that the Court either require the treating physicians to make 26(a)(2)(B) disclosures, or limit their testimony to facts contained within their own records.

Plaintiffs respond that these doctors' testimony falls within the treating-physician exception, and so they are not required to make 26(a)(2)(B) disclosures. Plaintiffs explain that in Minnesota, Defendant has a statutory right to meet and confer with the treating physicians. Moreover, unlike with expert witnesses, Rule 35 requires Plaintiffs to disclose all medical reports and related correspondence from treating physicians. Therefore, Plaintiffs conclude that in the present case, where Defendant has complete access to all of the treating physicians and their records, 26(a)(2)(B) disclosures are not necessary.

More directly, Plaintiffs contend that the treating physicians in question will not exceed the scope of the exception simply because they inquired into causation. Plaintiffs state that the treating-physician exception does not limit the present physicians' testimony to what is contained in their own clinical records. In response to Thomas, Plaintiffs cite the following section from Zurba v. U.S., 202 F.R.D. 590, 2001 WL 1090267 (N.D. Ill., September 17, 2001):

> The fact that a treating doctor proposes to give an opinion regarding the causation and permanency of his patient's injury does not by itself make him a retained expert for purposes of Rule 26(a)(2). Indeed, it is common for a treating physician to consider his patient's prognosis as well as the cause of the patient's injuries. See Finney-Seymour v. United Parcel Service of America, Inc.,

> No. 00 CV 2, 2001 WL 253044, at *1 (D.Vt. Jan. 22, 2001); Salas v. United States, 165 F.R.D. 31, 32 (W.D.N.Y.1995); Baker v. Taco Bell, 163 F.R.D. 348, 349 (D.Colo.1995). "Developing an opinion as to the cause of the patient's injury based on a physical examination ... is 'a necessary part of treatment' and does not make the treating physician an expert." Finney- Seymour, 2001 WL 253044, at *1 (quoting Brundidge v. City of Buffalo, 79 F.Supp.2d 219, 224 (W.D.N.Y.1999)). The same may be true regarding the permanency of the plaintiff's condition. If the physician formed such opinions during, and as part of, his treatment of the patient, they are no different from any other opinion--such as a diagnosis or decisions regarding the proper treatment--that he formed during the course of treatment. Testifying about such opinions at trial does not convert the treating physician into a retained expert for purposes of Rule 26(a)(2), as the opinions were not acquired or developed in anticipation of litigation or trial.
>
> In short, so long as Dr. Romero's testimony is limited to opinions he developed during and as part of his treatment of the plaintiff, his testimony will be permitted. The Court will require this foundation to be established before allowing Dr. Romero to render the opinions at issue.

From Zurba, Plaintiffs conclude that it is reasonable for the present treating physicians to testify in part based on information they learned from reading other medical reports.

With respect to Dr. Casey, Plaintiffs explain that when he interpreted a CT scan of Quinten Zink in 1998, his own report indicated that the case had been referred to him as a "follow up of neonatal herpes simplex infection." Therefore, Dr. Casey's diagnosis of "encephalomalicia from the prior congenital herpes insult," is an opinion developed as part of his treatment, and as such, should still fall within the treating-physician exception. To further emphasize that Dr. Casey should be regarded as a treating physician rather than an expert witness, Plaintiffs note that no lawsuit had been filed at the time Dr. Casey performed his examination.

With respect to Dr. Shanks, who was the child's neurologist while the family lived in

Florida, and Dr. Burstein, who is the child's current neurologist, Plaintiffs state that as treating physicians, both these doctors clearly had an interest in the origin of Quinten Zink's disability, and in projecting his future development. Accordingly, both these doctors reasonably inquired into Quinten Zink's prior medical record and included details from it in their own reports.

In summary, Plaintiffs emphasize that all of the testimony these treating physicians might give is connected with the treatment they performed for Quentin Zink. Further, there is no additional information that they are concealing from Defendant. Instead, these treating physicians' own reports and the additional medical reports that they have relied upon are all available to Defendant. Therefore, they provide adequate disclosure and there is no need to compel further reports.

The Court acknowledges that Defendant has significant access to these physicians and their reports, and if their testimony is limited to certain subjects, then 26(a)(2)(B) disclosures are not required. As treating neurologists, Drs. Burstein and Shanks can testify to Quentin Zink's current brain disorder and how it limits him, without providing 26(a)(2)(B) disclosures. And as a treating radiologist, Dr. Casey may testify to the results of the CT scan that he performed without providing a 26(a)(2)(B) disclosure.

With respect to testimony concerning causation, however, the facts provided in Defendant's motion and Plaintiffs' opposition are insufficient to enable the Court to determine whether Drs. Casey, Burstein, and Shanks should be treated as treating physicians or expert witnesses. Plaintiffs have represented to the Court that Dr. Casey had Quentin Zink's case referred to him because of herpes infection, and as a result, it is reasonable for him to offer his opinion concerning herpes as cause. Plaintiffs also state that Drs. Burstein and Shanks each had a

genuine interest in the herpes infection because they were Quentin Zink's neurologists. But Plaintiffs have not demonstrated to the Court that any of these physicians actually depended on their knowledge of the herpes infection, or their opinions as to causation in order to perform the procedures for which they were responsible. Further, with respect to Drs. Burstein and Shanks, it is not clear from the record whether they reviewed Quinten Zink's prior medical records before performing treatment, or only reviewed them after being asked by Plaintiffs' counsel for their opinions regarding causation.

But while Defendant offers a strict rule from Thomas that would necessitate treating all of the treating physicians as experts for the present issue, the Court notes that in virtually all subsequent cases citing Thomas, courts have either declined to follow it, or otherwise distinguished their cases from it. See e.g. Sprague v. Liberty Mut. Ins. Co., 177 F.R.D. 78 (D. N.H. 1998); Salas v. U.S., 165 F.R.D. 31 (W.D. N.Y. 1995); Zurba v. U.S., 202 F.R.D. 590 (N.D. Ill. 2001).

Moreover, Defendant has not demonstrated to the Court that Quinten Zink's treating physicians would not normally have considered issues of causation when performing treatment. Although there is an insufficient record at this point for the Court to make a ruling, the following analysis should aid the parties in determining how to progress in this matter.

Courts have continually dealt with this issue, and the limits on both sides are clear. Compare Patel v. Gayes, 984 F.2d 214, 218 (7th Cir. 1993) (holding that treating physicians presented with electroradiogram not used by them to treat plaintiff, and also asked to comment on general medical standard of care within the community qualified as experts rather than treating physicians), with McReynolds v. Bigler, 1990 WL 129454 (D. Kan. 1990) (holding that

testimony by treating physicians concerning cause of condition was within scope of treating-physician exception, where success of surgery depended on surgeon's understanding of cause of patient's condition).

Within the last decade, many courts have dealt specifically with treating physicians and the issue of causation. In Zurba, the court emphasized that treating physicians have a significant interest in causation and prognosis. 202 F.R.D. at 590. This proposition from Zurba is largely based on the court's observation in Finney-Seymour, that it is common for treating physicians to consider both cause and prognosis when performing treatment. 2001 WL 253044 at *1. Both of these cases conclude that treating physicians may be permitted to opine as to causation because knowledge of that issue is reasonably necessary for their treatment. Subsequent cases have continued to focus on this rationale. Salas v. U.S., 165 F.R.D. 31, 33 (W.D. N.Y. 1995) explains the issue as follows:

> The relevant question is whether these treating physicians acquired their opinions as to the cause of the plaintiffs' injuries directly through their treatment of the plaintiff. Patel v. Gayes, 984 F.2d 214, 218 (7th Cir. 1993). If so, then they must be treated as treating physicians, who can be deposed under the amendments to Rule 26 but who cannot be forced to file the written report required by Rule 26(a)(2)(B). As a general rule, a treating physicians considers not just the plaintiff's diagnosis and prognosis, but also the cause of the plaintiff's injuries. In this case, there is no indication that these treating physicians reviewed any medical records other than those involved in their care and treatment of the patient. Plaintiff is not asking these doctors to comment upon or review the opinions of other doctors. Each of these physicians in fact treated the plaintiff in the area of their specialty. Accordingly, questioning these physicians as to whether the injuries for which they treated the plaintiff can be causally related to the accident would appear to be within the scope of the patient's care and treatment.

In the present case, the work the treating physicians performed alone would not lead to a

conclusion concerning whether herpes contracted at birth was the cause of the injuries they detected. Instead, they would have to review the opinions of others doctors, as they clearly did. If reviewing these opinions was directly related to their treatment of Quentin Zink, and was a step these physicians would normally take in performing their procedures, then they may be permitted to opine as to causation. However, if these physicians had no reason to review these records in order to perform their treatment, then they did not acquire their opinions as to the cause of the injuries directly through their treatment, and consequently can not testify concerning causation without supplying 26(a)(2)(B) disclosures. Further, if these doctors did not in fact consider causation at the time of their treatment, but only afterwards, then they certainly may not opine as to causation without supplying 26(a)(2)(B) disclosures.

As a final note, Defendant states that he has made a good-faith effort to confer with Plaintiff's counsel in order to obtain the 26(a)(2)(B) disclosures. Consequently, he requests an award of costs and reasonable attorneys' fees in bringing this motion, pursuant to Rule 37(a)(4)(A) in this matter.

The Court declines to grant fees. The Court has no reason to believe that Plaintiffs' counsel acted in bad faith or otherwise unreasonably in this matter.

**THEREFORE, IT IS HEREBY ORDERED that:**

Defendant's Motion to Compel (Doc. No. 20) is **GRANTED** in part and **DENIED** in part as more fully set forth in this Order.

Dated: October 24, 2001

SUSAN RICHARD NELSON
United States Magistrate Judge