**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**Darcy A. Kornell, individually and as parent and natural guardian of Quinten Matthew Zink, a minor,**

**Plaintiffs,**

**v.**

**Hardin Olson, M.D.,**

**Defendant.**

**Civil No. 00-1836 (SRN)**

**ORDER**

---

Phillip A. Cole, Esq., Sheila A. Bjorklund, Esq., and Thomas A. Foster, Esq., on behalf of Plaintiffs.

Terence O'Loughlin, Esq. and Carolin J. Nearing, Esq., on behalf of Defendant.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on Defendant's Motion in Limine to Exclude Expert Testimony and for Partial Summary Judgment (Doc. No. 29).[1] The Court held a Daubert hearing on November 28 and 29, 2001. After the hearing, the Court permitted both parties to submit supplemental briefing on this matter. A supplemental oral argument then took place on January 11, 2002.

Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties waived their right to proceed before a United States District Judge, and voluntarily consented to have all proceedings in this case, including the entry of judgment, conducted and

[1]Plaintiffs also brought a motion to exclude Defendant's expert opinions that Plaintiff's brain damage was caused by cytomegalovirus. The Court will address that motion in a separate Order.

FILED ____________
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD ________
DEPUTY CLERK ________

determined by the undersigned United States Magistrate Judge. It was so ordered by the Honorable James R. Rosenbaum, Judge for the United States District Court for the District of Minnesota.

This Order addresses that motion.

## I. DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY AND FOR PARTIAL SUMMARY JUDGMENT.

### A. Factual Background.

This motion arises out of medical malpractice claims brought by Plaintiffs against Defendant Hardin Olson, M.D. Dr. Olson, an obstetrician and gynecologist, provided obstetrical care to Plaintiff Darcy Kornell during her pregnancy, labor and the delivery of her son Quinten Zink in October 1997. (Amended Complaint.) The Court's jurisdiction over this controversy is based upon diversity of citizenship under 28 U.S.C. § 1332, in that the Plaintiffs are residents of the State of Florida, and the Defendant is a resident of the State of Minnesota. Id. Dr. Olson is now retired, but at the time relevant to this lawsuit he was an obstetrician and gynecologist on staff at Fairview University Hospital, and was associated with the University physicians' group in clinical practice. (Affidavit of Carolin J. Nearing (Nearing Aff.); Exh. B: Deposition of Hardin Olson (Olson depo.) at 5 & 9.)

#### 1. October 3, 1997 Prenatal Visit.

On Fridays, as part of his clinical practice, Dr. Olson saw patients at the Palen Clinic. Id. at 10, 42, 51. During a pre-natal clinic visit on Friday October 3, 1997, Ms. Kornell pointed out to Dr. Olson a 1.5 cm. multi-vesicular lesion on the medial gluteal region of her upper right thigh, approximately 4-5 cm. from her vulva, and not on her genitals. Id. at 44-45, 51, 54. Ms.

Kornell noted that the lesion had not been present previously, and Dr. Olson thought it was probably herpes zoster, a chicken pox virus. Id. at 45-46. Dr. Olson did not, however, rule out the possibility that the lesion could be a recurrent (not primary) herpes simplex virus type 2 (HSV 2) infection. Id. at 45-49. Dr. Olson obtained a culture in order to identify the lesion. Id. at 49-50. In addition, Dr. Olson prescribed an antiviral medication, Zovirax, which covered both herpes zoster and HSV 2, and instructed Ms. Kornell to report for a repeat ultrasound on Monday October 6, 1997, due to his concern about the fetus' intra-uterine growth retardation (IUGR). (Nearing Aff.; Exh. C: Deposition of Darcy Kornell (Kornell Depo.) at 33-40.) The culture was sent to an outside laboratory and Dr. Olson anticipated that the results would be returned to the Palen Clinic in four to five days. (Olson depo. at 50.) Because Dr. Olson was only at the clinic once a week on Fridays, it was customary for him to view lab results on Fridays, and, in this case, he expected to see the culture results on Friday October 10, 1997. Id. at 52. It was not routine for the Palen Clinic to contact Dr. Olson with results of lab tests between his Friday visits to the clinic. Id. at 52-53.

**2. October 6, 1997 Admission to Fairview University Hospital for Delivery.**

On Monday October 6, 1997, at approximately 1530 hours, Dr. Olson admitted Ms. Kornell to Fairview University Hospital for induction of labor and delivery. (Nearing Aff.; Exh. D: Fairview Obstetric Admission Database.) Dr. Olson was concerned about the well-being of the fetus due to IUGR, a non-reassuring non-stress test of the fetal heart rate, and Ms. Kornell's developing pre-eclampsia. (Olson depo at 36-44.) Quinten Zink was delivered vaginally at 2335 hours by Dr. Olson . (Fairview Obstetric Admission Database at 7.)

Dr. Olson testified that, at the time of Ms. Kornell's labor and delivery on Monday October 6th, he completely forgot about the lesion he had seen and cultured for lab analysis on Friday October 3rd. Olson depo. at 69-71. He also testified that if he had not forgotten seeing the lesion, he would have recommended covering the lesion with an occlusive dressing and then delivering the baby vaginally. Id. at 50, 70. This is the method of delivery recommended by the American College of Obstetricians and Gynecologists (ACOG) for patients with recurrent HSV-2 non-genital lesions. (Nearing Aff.; Exh. E: ACOG Practice Bulletin.) Dr. Olson also testified that, had he not forgotten seeing the lesion, he would have conducted an informed consent discussion with Ms. Kornell about the risks and benefits of the alternatives of vaginal delivery with an occlusive dressing and cesarean delivery. (Olson depo. at 86.)

The lab report regarding the culture of Ms. Kornell's lesion was dated October 6, 1997, at 3:16 p.m. Id. at 59. No one involved in this lawsuit knows whether the lab report had been received by the Palen Clinic prior to Ms. Kornell's delivery. Id. at 59, 72-74.

**3. Quinten Zink Develops Lesions.**

On October 10, 1997, four days after he was born, Quinten Zink developed vesicular lesions. (Olson depo. at 71, 72.) It was not until after Quinten Zink developed these lesions, that the neonatalogists caring for Quinten Zink learned that the culture of Ms. Kornell's lesion was positive for HSV-2. Id. at 71. Dr. Olson testified that he does not recall whether he was aware of the results of Ms. Kornell's culture prior to the time Quinten developed lesions. (Olson depo. at 71, 72.) On October 11, 1997, Quinten Zink was started on a 14-day course of acyclovir administered intravenously. (Nearing Aff.; Exh. C: 10/11/97 Pediatric Infectious Disease Consult Progress Note.) Within seven days of therapy, the lesions had completely resolved.

(Nearing Aff., Exh. L: 11/1/97 Discharge Letter.) On October 25, 1997, Quinten Zink was discharged with a diagnosis of HSV-2 limited to the cutaneous area. Id. Quinten Zink was to continue with suppressive therapy of acyclovir[2] as a prophylaxis against additional outbreaks. (Nearing Aff.; Exh. M: 10/25/97 Pediatric Infectious Disease Consult Progress Note.)

**4. Medical Testing of Quinten Zink.**

During his hospitalization, Quinten Zink was also tested for Central Nervous System (CNS) type herpes. No signs or symptoms of CNS herpes were found. Quinten Zink did not suffer from fever, lethargy, or seizures. (Nearing Aff., Exh. L, K: NICU Discharge Summary Letter, and N: 10/13/97-10/24/97 Progress Notes.) Blood tests indicated a normal white blood cell count (WBC), and polymerase chain reaction[3] (PCR) analysis of the cerebral spinal fluid was negative for the virus.

On March 24, 1998, Quinten Zink suffered a recurrence of herpes skin lesions. (Nearing Aff.; Exh. Q: Palen Clinic Records & Exh. R: Pediatric Clinic Outpatient Notes.) Quinten Zink suffered two additional recurrences of skin lesions on May 20, 1998 at 7 ½ months of life, and on or about July 20, 1998 at 9 ½ months of age. (Bjorklund Aff.; Exh. 9: Outpatient Records.) At nine months of life, neurologic findings and developmental delays, including poor head growth and decreased use of left upper extremity prompted Quinten Zink's pediatric disease physician, Dr. Laura Hoyt, to order a head CT scan, which was performed on July 13, 1998. (Nearing Aff.;

---

[2]A synthetic antiviral agent used in the treatment of herpes.

[3]Polymerase chain reaction is a method for taking small amounts of DNA (as could be found in the cerebral spinal fluid) and amplifying them to larger quantities so that they are more readily detectable. This technology has been in existence for approximately 10 years. In United States v. Beasley, 102 F.3d 1440 (8th Cir. 1996), the Eighth Circuit found that PCR technology was sufficiently reliable to be admissible under Daubert.

Exh. R: Pediatric Clinic Outpatient Progress Notes.)

Dr. Sean Casey, the radiologist who interpreted the scan, identified abnormalities on the scan as "calcifications," "closed lip schizencephaly or other forms of migration abnormalities," and "vague hypodensity in the subcortical white matter of the left temporal lobe which may represent an area of encephalomalacia from the prior congenital herpes insult." (Nearing Aff.; Exh. S: Radiology Report.) As a result of his observations, Dr. Casey recommended a further work up with an MRI scan. Id. An MRI scan was performed, and Dr. Kenneth Cross, the radiologist who interpreted the scan, described the findings as "consistent with the patient's clinical history of neonatal infection," and identified abnormalities on the scan as "generalized brain atrophy," "leukomalacia," "periventricular calcifications," and a "possible migration abnormality." (Nearing Aff.; Exh. T: November 9, 1998 Regions Hospital Radiology Report.)

Dr. Kriel discussed the results of the scan with Quinten Zink's parents and suggested that the abnormal MRI was "very possibly" related to "whatever caused the IUGR." (Nearing Aff.; Exh. U: 11/16/98 Examination Report.) She also stated that "it is less certain whether or not the neonatal herpes infection is causally related as that most commonly would have been acquired somewhat later, that is during the birthing process." Id.

**5. Current Diagnosis.**

Quinten Zink now has been diagnosed with cerebral palsy. He suffers from developmental impairments involving cognitive ability, and language and motor dysfunction with a spastic quadriparesis more prominent on the left. (Nearing Aff., Exh. V: November 29, 2000 Burstein letter.)

**B. Plaintiffs' Expert Testimony.**

**1. David W. Kimberlin, M.D.**

Dr. David Kimberlin is a nationally-known pediatric infectious disease specialist with the University of Alabama at Birmingham, School of Medicine. Dr. Kimberlin opines that Quinten Zink acquired the HSV-2 infection during the vaginal birth. (Bjorklund Aff.; Exh. 27: Kimberlin Disclosure.) Dr. Kimberlin explained his conclusion as follows:

> He did not present any clinical signs of HSV-2 infection at the time of his birth, nor did he become sick within the first 24 hours of life. By definition, infants with *in utero* acquisition of HSV-2 manifest evidence of illness within the first 24 hours of life. The classic trial of findings at birth or within the first 24 hours of life in infants with *in utero* HSV are cutaneous manifestations (scarring and/or active vesicular lesions), central nervous system abnormalities (microcephaly, seizures, etc.), and ophthalmic involvement (retinitis, microophthalmia). Quinten Zink did not have any such findings within the first 24 hours after birth.

Id. During his deposition, Dr. Kimberlin was questioned extensively concerning whether the infection was limited to the cutaneous or skin, eyes, and mouth (SEM) type, or whether it could have also been a central nervous system (CNS) type, capable of causing the encephalitis (inflammation of the brain).[4] (Bjorklund Aff.; Exh 27: Kimberlin Deposition.)

Dr. Kimberlin explained his opinion that the herpes had not spread to Quinten Zink's central nervous system during the neonatal period as follows:

> The information that, to my recollection, is included in the documents, includes CSF indices, white blood cell count and red blood cell count two days into his course of intravenous acyclovir. It was a bloody tap with many, many red

---

[4]The Court recognizes that Plaintiffs intend to use Dr. Kimberlin's report only to demonstrate that Quinten Zink acquired HSV-2 during the birthing process. The subsequent quotations from his deposition are not intended to demonstrate any shortcoming of that conclusion. They are being used in this Order simply to isolate what medical evidence would be relevant to support Plaintiff's claim that Quinten Zink's neurologic deficits were caused by an infection that resulted from improper delivery.

blood cells, I believe over a hundred thousand, and zero white blood cells.

The follow-up LP was obtained eight days into therapy, and had, I believe, ten white blood cells, just a handful of red blood cells.

Q. Ten white cells, you mean?

A. Ten white cells and just a handful of red blood cells. And a protein and glucose that were normal. In addition, a CSF/PCR for herpes was sent at that time which was documented in the progress notes section of the medical record as being negative.

The patient never had any clinical symptomatology at that time to suggest central nervous system disease such as seizure activity. So, to my way of looking at it, there was no clinical symptomatology to suggest CNS disease, and the laboratory information which was obtained failed to show CSF inflammation albeit suboptimally on the day two specimen since it was a bloody tap.

In addition, the PCR as part of that lab workup was negative on day eight. We don't know what it was on day two, but we have no documentation that it was positive. So if the baby had CNS disease acquired in the peripartum period, that had gone unrecognized - strike that. If he had had CNS disease in the peripartum period as part of his assessment, we would have seen abnormalities or we would have expected to see abnormalities on those lab tests that I just mentioned, or clinical symptomatology.

Q. You would have seen a positive PCR?

A. Or an elevated CSF white count, elevated CSF protein. Some sort of identification that there was involvement of the CNS going on at that particular moment.

(Kimberlin Depo. 14-17.) Dr. Kimberlin was also questioned by Plaintiffs' counsel concerning the possible signs of CNS herpes.

Q. Okay. And I am just taking these individual elements. So you can't argue credibly in your judgment that the fact that he [Quinten] wasn't sick means he didn't get CNS by itself?

A. No. Short of seizures, in order to prove CNS involvement, you would need some sort of a diagnostic evaluation, be that looking at spinal fluid and testing spinal fluid by doing the lumbar puncture or by imaging studies, CT scan, for instances, or by EEG. Those types of diagnostic

modalities would be what would be required to prove or disprove CNS involvement.

Id. at 50-51

Dr. Kimberlin stated the basis for his conclusion that the herpes had also not entered the central nervous system by the end of nine months as follows:

The data we have to understand the subsequent development of neurological sequelae following skin, eye, mouth disease is best summarized in a 1991 New England Journal set of articles.

Q. Two articles.

A. Two articles. One a safety efficacy article, the other a natural history article, predictors of morbidity and mortality article. . . .

In that predictors of morbidity and mortality paper, the correlation was observed between a baby with skin, eye, mouth disease caused by HSV type two who has three or more cutaneous recurrences within the first six months of life, that such a baby would be at increased risk of neurologic sequelae in the future. And indeed, all of the skin, eye, mouth babies that did subsequently develop neurologic sequelae in that study, all had HSV type two and all had three or more cutaneous recurrences in the first six moths of life.

This particular patient, Quinten Zink, had only one documented recurrence, cutaneous recurrence of his herpes within the first six months, that one occurred, I believe, at about five and a half months of age.

Q. In March, I think, of '98?

A. So I don't see a correlation in this clinical case with what is in the large prospectively conducted clinical studies that would put him at increased risk of CNS, or at any risk, perhaps, or CNS sequelae if we assume that his initial clinical presentation was of skin, eye, mouth disease.

And in my view, the totality of the data would suggest that, in fact, he did have skin, eye, mouth disease in the neonatal period and not CNS disease.

Q. Okay. So on the basis of the available scientific data that you consider reliable, the evidence leads you to the conclusion, as you've just expressed, that Quinten Zink's brain damage and neurologic deficits were not caused by herpes infection?

A. In my view, that's correct.

Id. at 18-20.

**B. Athi Narayan, M.D.**

Dr. Narayan is a neonatologist, retained by Plaintiffs to offer an opinion concerning standard of care and causation. Dr. Narayan first concluded that the necessary standard of care was not followed in the mode of delivery. (Bjorklund Aff.; Exh 28: Narayan Disclosure.) He then made the following observations concerning whether Quinten Zink's current symptoms have any relationship to the neonatal HSV infection:

> **a)** Intrauterine Growth Restriction
>
> In Quenten's [sic] case the IUGR was not early or severe. Most probably it occurred in late gestation perhaps around 30 wks. or so and the type of neurologic handicap Quenten has is not a common occurrence with IUGR. The MRI findings are not consistent with simple IUGR without the addition of some other insult.
>
> b) **Schizencephaly**
>
> The MRI findings of atrophy, leukomalacia and calcification are more supportive of an infectious etiology ie. HSV-encephalitis. Schizencephaly in this case should have been acquired from the infection as has been reported with cytomegalovirus infections. Commonly associated CNS anomalies with congenital schizencephaly such as absence of septum pellucidum or absent corpus callosum was not seen in this MRI. The fetal ultrasound showed normal intra-cranial structures at 36 weeks gesation [sic]. No head ultrasound or CAT scan was done in the immediate neonatal period to make any conclusion as to the timing of the occurrence of the findings noted on MRI at 13 months of age. These factors weigh against schizencephaly as the primary cause of the neurologic sequelae.
>
> C) **Neonatal HSV Encephalitis**
>
> The clinical history and MRI findings with the asociated [sic] neurologic sequelae support HSV encephalitis as the most probable cause of Quenten's cerebral palsy. "In newborn infants herpes simplex virus

> (HSV) infection can manifest as (1) (generalized systematic infection involving the liver and other organs including the central nervous system (CNS), encephalitis (2) localized CNS disease or (3) disease localized to the skin, eyes and mouth (SEM). Ocular manifestations include conjunctivitis, keratitis, and choreorethinitis. In approximately one third of the patients, SEM involvement is the first indication of the infection. In another one third of the patients other evidence of systematic or CNS disease can occur before the appearance of SEM lesions. Neonatal herpetic infections are frequently severe with a high mortality rate and substantial neurologic and/or ocular impairment in survivors, particularly in the absence of antiviral therapy. Disseminated disease normally occurs during the first 2 weeks of life." (Red Book-American Academy of Pediatrics).

In Quenten's case HSV encephalitis could not be completely ruled out since spinal fluid could not be obtained early during the active infection until 10/1899 [sic] (12 days of life and 8 days after acyclovir therapy) A negative PCR (polymerase chain reaction) and absent white cells response in the CSF at this time are not adequate to exclude the presence [sic (of)] CNS infection from birth until 12 days of age. Thus the most probable cause is neonatal HSV-infection acquired during vaginal delivery from maternal primary HSV-Type II genital infection with the resulting neurologic sequelae. In all probability this could have been prevented if primary c-section with intact membranes would have been chosen as the mode of delivery.

Id.

### 3. Luis Villar, M.D.

Dr. Villar, a clinical professor at the University of Minnesota Medical School, is an infectious disease specialist with a specific research interest in cytomegalovirus.[5] Dr. Villar opines that Quinten Zink acquired HSV-2 during his delivery. (Bjorklund Aff.; Exh 31: Luis Villar Disclosures.) He offers no opinion as to the timing or cause of the schizencephaly noted on the CT and MRI reports. He does, however, offer an opinion concerning the calcification in

---

[5]A group of viruses in the family Herpesviridae which cause enlargement of cells and development of characteristic inclusions in the cytoplasm or nucleus.

the periventricular and subcortical white matter. He reasons as follows:

> It is well documented in the medical literature that the TORCH infections (toxoplasmosis, rubella, cytomegalovirus and herpes) can cause injury to the brain with resultant calcifications. The patient need not exhibit frank symptoms such as high fever, lethargy or coma, to have encephalitis. The findings of leukomalacia and calcifications on CT and MRI here are consistent with a viral encephalitis. The lumbar punctures done on Quinten 10/12/97 and 10/18/97 are inconclusive in ruling out HSV-2 CSF involvement. . . . His mother tested negative for CMV and histoplasmosis[6] at the end of her first trimester of pregnancy. The mother's rubella tier was sufficiently high when tested prenatally to render her immune from this disease. The placental pathology shows no evidence of in utero viral infection. Additionally, Quinten showed no clinical evidence of a CMV infection at birth such as hyperbilirubinemia, petechial rash, splenomegaly or thrombocytopenia. Moreover, a CMV antigenemia assay October 10, 1997 was negative. 10/10/97 was the day he developed skin lesions that cultured positive for HSV-2, HSV-2 is the only TORCH infections or any infection documented by laboratory studies in this case. All of the clinical evidence supports the conclusion that Quinten's HSV-2 infection caused his brain injury and substantially contributed to his neurological and cognitive deficits.

Id.

#### 4. Janice Ophoven, M.D.

Dr. Ophoven is a pediatric forensic pathologist. (Bjorklund Aff.; Exh. 29: Ophoven Disclosure.) Dr. Ophoven reviewed the placental slides of Darcy Kornell, the pathology report of Monna Grotte, M.D., Quinten Zink's prenatal, labor and delivery records, his medical records from birth to present, and Defendant's pathology expert Carolyn Salafia's report. Dr. Ophoven stated, "there is nothing in this placenta that is pathognomonic[7] of an intrauterine viral infection, ie. Herpes simplex virus or other virus. While there is evidence of chorioamnionitis, this is not

---

[6]The official clinic records do not indicate that such a test was ever performed. In addition, during the November 28 and 29, 2001 hearing, Dr. Olson testified that he had never ordered that this test be performed. Hence, the evidence before the Court contradicts Dr. Villar's statement, and reduces the credibility of his differential diagnosis.

[7]Characteristic or indicative of a disease.

the type associated with intrauterine viral infection." Id. Dr. Ophoven also doubts the accuracy of the reported weight of the placenta. She stated, the weight of the placenta, as reported in Monna Grotte, M.D.'s original pathology report, of 114 gms is, more likely than not, an error. This weight it not consistent with Dr. Grotte's assessment that this was a mature placenta and further is not consistent with the reported gross dimensions of the placenta." Id. She further explained:

> There is evidence of an old infarct[8] occurring weeks before delivery. There are a myriad of factors in Ms. Kornell's pregnancy history that could have contributed to this infarct, including her history of urinary tract infection, pregnancy induced hypertension, smoking during the pregnancy, and her young age. This infarct likely contributed to this child's symmetrical intrauterine growth retardation. This infarct would have no affect [sic (effect)] on the overall weight of the placenta however.
>
> The schizencephaly note on this child's CT scan and MRI may be related to the noted placental infarct. There is further no pathology in this placenta to explain this infant's temporal lobe lesion seen on CT scan and MRI.

**5. Steven Pollei, M.D.**

Dr. Pollei is a neuroradiologist. (Bjorklund Aff.; Exh. 30: Disclosure of Steven Pollei.) Dr. Pollei has reviewed the prenatal ultrasound from September, 1997, and the two CT scans from July 1998, and December, 2000. He has also read the reports of the radiologists who interpreted these studies. Dr. Pollei was provided with Quinten Zink's clinical history. When inquiring of Dr. Pollei's opinion, Plaintiffs' counsel asked him to assume the following information to be accurate:

---

[8]An area of necrosis resulting from insufficient blood supply.

- On March 25, 1997, a date that would coincide with the end of the first trimester of Darcy Kornell's pregnancy according to the EDC estimated by Dr. Olson, testing of Ms. Kornell for cytomegalovirus[9] and histoplasmosis[10] were negative.

- Quinten Zink was infected with HSV II in the course of his vaginal delivery on October 6, 1997 and suffered the first symptomatic outbreak of the disease four days later when he exhibited a cutaneous rash. He was treated with high dosage Acyclovir. He has never exhibited the symptoms of a severe encephalitic illness, i.e. high fever and extreme lethargy or coma, but such symptoms are not a prerequisite to encephalitic injury from the virus. Since the initial outbreak, Quinten has suffered numerous outbreaks of herpes which have been treated with Acyclovir. The initial care of Quinten for his ailment was with Dr. Laura Hoyt, a pediatric infectious disease specialist. Dr. Hoyt believes there was not sufficient evidence to conclude that Quinten had herpes encephalitis. Other physicians hold this view while experts testifying for Quinten Zink believe the encephalitis is the product of the HSV II.

- Examination of the placenta reveals that it is not pathognomonic of an in utero viral infection.

- Quinten Zink never exhibited the symptoms of an in utero CMV infection which would include hyperbilirubinemia, petechial rash splenomegaly and thrombocytopenia. On October 10, 1997, the day of the symptomatic outbreak of HSV II, Quinten tested negative on a CMV antigenemia assay.

- Four attempts were made to isolate the DNA of the Herpes virus in the CSF by polymerase chain reaction between October 12 and October 18. Only the final test yielded enough fluid and was negative for the DNA but is not considered valid to rule out CSF infection with the virus because of the administration of antiviral agents for more than a week.

- The mother's Rubella antibody index was sufficiently high when

---

[9]A group of viruses in the family Herpesviridae which cause enlargement of cells and development of characteristic inclusions in the cytoplasm or nucleus.

[10]An infectious disease usually acquired by inhalation of spores of the fungus in soil dust.

tested prenatally to render her immune from this disease.

Dr. Pollei produced the following opinion:

> [t]he most likely cause of the encephalitic injury to Quinent Zink's brain is the neonatal herpes infection. Although milder than the devastation seen in many cases of herpes encephalitis, the pattern of injury seen here is consistent with a herpes infection. The natural suspicion that the schizencephaly and the encephalitis are the result of a single in utero infection is not supported by the medical evidence in this case. The mother tested negative for CMV and histoplasmosis at the end of the first trimester. The timing of this test is important because the likely timing of the migration disorder is around the end of the first trimester. The other TORCH infection, Rubella, was known not to be present here. The antigen assay in the child in the first week of life was negative for CMV. Moreover the encephalitic injury is global in its impact while the migration disorder is distinctly unilateral. The absence of the signs of an in utero infection on the placenta and the grossly normal prenatal ultrasound lend further weight to the conclusion that the encephalitic injury and the schizencephaly are unrelated. The only known encephalitic agent present in this case is the neonatal HSV II infection. The most likely etiology for the encephalitic injury seen radiographically in this case, is the neonatal HSV II infection.

### C. Testimony From Hearing.

On November 28 and 29, 2001, a hearing was held on Defendant's motion. During this hearing, Defendant presented multiple witnesses who offered opinions concerning the cause of Quinten Zink's current neurological deficits. Plaintiffs, however, did not present their own witnesses to testify, they chose instead to present their experts' opinions through affidavits.

#### 1. Charles G. Prober, M.D.

Dr. Prober is a nationally-known pediatric infectious disease specialist. (T.21.)[11] Dr. Prober, helped Dr. Richard Whitley of the University of Alabama to conduct a multi-center

[11] All references to the transcript of the November 28, 29, 2001 hearing are identified as (T.__.)

collaborative herpes study group between 1981-89. This group was sponsored by the National Institute of Health (NIH), and specifically, the National Institute of Allergy and Infectious Diseases (NIAID). (Tr. 24-25.) The study was published in the New England Journal of Medicine in 1991. (Tr. 25.) Dr. Prober was asked to comment on Plaintiffs' claim that all or at least most of Quinten Zink's brain abnormalities and neurologic deficits were caused by a herpes encephalitis that was contracted during the delivery process. (Tr. 41.)

THE COURT. If you – if a baby has SEM herpes as a result of exposure to HSV-2 and it recurs, can that recur as a CNS infection or a disseminated infection or will it recur as an SEM infection?

A. If the SEM infection that that baby had, I mean originally had was an SEM infection it will recur as skin infection. If on the other hand the baby also had CNS involvement, central nervous system involvement, when it had the SEM infection originally, then when it recurs there's some indirect evidence that suggests maybe it also recurs in the brain.

So if it was in the brain to begin with it may recur in the brain. If it was not in the brain in the first place it does not go to the brain.

Q. So going back to plaintiff's claim that Quinten developed a CNS type of herpes or herpes encephalitis during the delivery process or at some time thereafter in the first six months or so of life, taking that as their claim, is there one or two hypotheses that we should discuss in terms of exploring whether there is medical evidence to support such a thing? . . .

A. Well, the critical question in my mind that I think I should try to answer is whether or not there was any evidence that Quinten Zink had central nervous system involvement as part of his neonatal herpes. Because if he did not have central nervous system involvement as part of his neonatal herpes he should not suffer central nervous system consequences as a result of his herpes. Because as I responded to the Judge, if you do not have central nervous central [sic (system)] involvement to begin with you shouldn't somewhere down the line have the central nervous – when the skin recurrence occurs, how did it go to the brain? That should not happen.

One can hypothesize that it could happen. It's possible that that can happen. But in my opinion it is extraordinarily unlikely that that would

> happen. So the main issue in my mind is whether Quinten Zink had neonatal CNS involvement.

(Tr. 42-43.)

Dr. Prober then went on to explain why he believed there was no reliable medical evidence indicating that Quinten Zink had CNS herpes in the neonatal period or that his brain abnormalities were caused by a herpes encephalitis contracted either during or after delivery. (Tr. 55, 65.) Dr. Prober explained that there are clear criteria articulated in research publications and textbooks that distinguish between CNS herpes and SEM herpes:

> Children to be classified as having CNS neonatal herpes have to have CNS signs or symptoms of involvement. The most typical being seizure disorder as I referred to earlier. More than 90 percent of newborns with central nervous system involvement from herpes will have seizures. So most of them have those sorts of symptoms.
>
> A second issue that was looked at in trying to classify babies or in classifying babies is what the results of their spinal fluid examination is, the so-called CSF, cerebral spinal fluid, examination. . . . And that is done by doing what is called a lumbar puncture, putting a small needle into the bottom of the back, into the spinal canal to get fluid. That fluid is then sent to the laboratory for analysis. If a baby had central nervous system involvement they have to have an abnormal number of white blood cells in their cerebral spinal fluid that has been sampled and/or an abnormally high protein concentration.[12]
>
> The other things one looks for in classification is whether they have an abnormal electroencephalogram if that was obtained. That looks to the brain waves as to whether they are abnormal or not and neuroimaging studies may be done to determine if they've got a typical lesion that is associated with neonatal CNS disease.
>
> So the critical features relate to the abnormal CSF and the signs and symptoms. Now in more recent times, that is, now, we also obtain CSF for PCR to see if there's any evidence of HSV DNA present.

---

[12]The high white blood cell production is a reaction to an infection in the brain, which is what CNS herpes produces. The elevated protein levels released into the spinal fluid are the direct result of the destruction of the brain that results from such herpes. (Tr. 48-49.)

(Tr. 45-46.)

Dr. Prober then noted that Quinten Zink had none of these signs and symptoms. (Tr. 48.) Hence, Dr. Prober was able to conclude that in his opinion there was no scientific evidence in the neonatal period that Quinten Zink had CNS herpes. (Tr. 55.)

The Court inquired of Dr. Prober, whether the acyclovir treatment could have impacted the reliability of the PCR to indicate the presence of herpes in the spinal fluid. He stated that despite such treatment, 80% of babies with herpes encephalitis will still test positive. (Tr. 35.) The Court also asked about the reliability of the PCR testing, given that it was performed at six and twelve days of life, while the peak of time for presenting CNS herpes signs would be at approximately 17 days of life. Dr. Prober responded that the time for presenting can actually be plotted as a bell-shaped curve, with a range of presentation that spans from just after birth to approximately 32 days of life. (Tr. 51.) Hence, while Quinten Zink's testing occurred before the peak of presentation, the PCR test could still have turned out positive. Nevertheless, he conceded that seventeen days of life would have been the optimal time for the test. (Tr. 52.)

Dr. Prober also addressed the question of whether it was possible for Quinten Zink to have had some sort of CNS involvement without any signs of symptoms. He described the New England Journal article he had coauthored, and explained that it summarized the collaborative study in which 4 of 29 infants who were thought to have only SEM herpes, eventually developed neurologic deficits by one year of life. (Tr. 47, 55-65.) In this test, 15 of the 29 infants had less than three recurrences of cutaneous outbreaks within the first six months of life. And none of these 15 infants developed neurologic problems at one year of life. (Tr. 56.) All of the other 14 had at least three cutaneous outbreaks within the first six months of life, and four had neurologic

deficits at one year of life. (Tr. 56.) Dr. Prober explained the idea behind this study as follows:

> The hypothesis was that when babies have cutaneous disease in the newborn period, there may be a subset of those babies, a number of those babies who have silent brain involvement. And that if they have – first of all that's a hypothesis, not – that was considered a possibility.
>
> And if they have subtle brain involvement in the newborn period and they have recurrences of their skin over the first six months perhaps the hypothesis went, they also have recurrences of the subtle involvement of their brain. And therefore if a baby with SEM disease has these frequent recurrences perhaps we should also worry that they won't be as smart as a baby that has less recurrences.
>
> Based upon that hypothesis a study was designed and is still being conducted to take babies with clinically evident SEM disease and randomly assign them to receive chronic acyclovir therapy versus not receive acyclovir therapy.
>
> Because if the hypothesis is true what one would hope to happen is that the acyclovir will prevent the recurrences in the skin and the subtle subclinical recurrence of the brain and the babies will be smarter. So that's the hope of the study. And that's driven by the hypothesis of this silent involvement.
>
> That study has now been ongoing for a number of years and is still not completed.

(Tr. 58-59.) Dr. Prober later emphasized that "the defining" factor of the babies with neurologic deficits was that they had three or more cutaneous recurrences within the first six months. He then said that in the case of Quinten Zink, who had only one cutaneous recurrence within the first six months of life, "he would have normal neurologic outcome." (Tr. 61.)

On cross examination, Plaintiffs' counsel addressed this study as well:

> Q. Are you suggesting that the observation of 29 patients establishes scientifically that a child must have three recurrences in six months in order to have SEM-related CSF [sic (CNS)]?
>
> A. It's as good as it gets. It is the largest series of observation of babies who had cutaneous recurrences.
>
> Q. Are you suggesting that it is scientific proof that excludes the fact that a baby who has 30 recurrences in two years cannot therefore have CSF [sic

(CNS)] disease?

A. No. I think anything is possible. It's just not consistent with the observations that have been made today.

Q. In 29 patients?

A. In 29 patients, correct.

(Tr. 78-79.)

Dr. Prober also explained that at the time this survey was conducted, PCR testing was not yet being used. Once PCR technology was developed, some samples from the original survey remained and were retested. Of these remaining samples, seven tested positive. And of those seven samples five corresponded to infants who were normal at one year of life, one corresponded to an infant who had suffered neurologic deficits, and one was lost to follow up. (Tr. 57.) Although only a minority of the original samples remained, Defendant's counsel asked the following question to Dr. Prober:

A. But does that – the fact that now you've found some babies originally thought to have SEM disease but positive PCRs, does that mean we didn't really get them categorized properly, the first time and they didn't really have just cutaneous herpes but because they had a positive PCR in retrospect they in fact had CNS?

Q. That may be the case.

(Tr. 60.)

Finally, Dr. Prober again addressed the question of whether Quinten Zink could have had only SEM herpes during the newborn period, but that this infection eventually led to brain involvement. Dr. Prober stated that this theory was implausible and improbable. He explained his opinion as follows:

And the reason for that is that when you have recurrences of herpes and

> whether it's oral herpes such as adults get or genital herpes such as adults get or skin recurrences, it is not recognized as being associated with a viremia.[13] The recurrence tends to be very self-limited not widespread. And the reason for that is that the body's immune system has already figured this virus out at that point so they protect it from spilling into the blood.
>
> And the way herpes recurs is that it crawls down the nerve to where it recurs. It doesn't get anywhere near the blood. It's in the protection of the nerve sheath. So that's probably why viremia doesn't occur as a result of recurrence.
>
> So I think it's highly unlikely, not impossible, because I guess anything is possible. But it's highly unlikely that a recurrence of a skin lesion would result in viremia, CNS spread and encephalitis at five and a half months of age.

(Tr. 64.) At the end of his testimony, the Court asked Dr. Prober the following question:

> The Court at this stage of the game is not looking to whether or not you have a difference of opinion with the plaintiffs' experts. That is not the issue before me. The issue before me is whether in your view there is any reliable scientific literature or evidence anywhere, of [sic (with)] which you would agree or disagree, but any reliable scientific literature or evidence anywhere which support the diagnosis in this case that CNS herpes in this baby caused neurologic deficits?
>
> A. I don't believe there is such literature.

(Tr. 89-90.)

**2. Carolyn Salafia, M.D.**

Dr. Salafia is a nationally-known pathologist, who specializes in placental pathology. She examined Quinten Zink's placenta. She found that gross (naked eye) and microscopic examination of the placenta revealed significant dead tissue (necrosis) as well as inflamed villi[14] (villitis). (Tr. 109-113.) Specifically, she believed that necrotic (dead) tissue covered 15-20% of

---

[13]The presence of a virus in the bloodstream.

[14]The villi are extensions of the placenta through which a baby's blood receives oxygen and nutrients from its mother.

the maternal surface of the placenta. (Tr. 138-39.) Dr. Salafia stated that, in terms of necrosis and villitis, Quinten Zink's placenta was "one of the ten worst cases I've seen in 15 years of doing exclusively perinatal pathology." (Tr. 126.) Dr. Salafia stated that the differential diagnosis for such a placenta is either a "congenital[15] viral infection or maternal/auto or auto-immune pathology." (Tr. 113.).

Dr. Salafia also observed that the placenta weighed only 114 grams, which she termed "extremely small" as compared to a normal placenta for an average weight newborn, which would be approximately 500 grams. (Tr. 100-01.) She then drew connections between the small size of and damage to Quinten Zink's placenta, and his IUGR and microcephaly[16] at birth. Dr. Salafia explained that the damage to the placenta would decrease the supply of oxygen and nutrients to the baby, and likely cause these symptoms. (Tr. 126-27.) Dr. Salafia further stated that she believed the placental problems related to Quinten Zink's neurologic abnormalities. She explained:

> Well, the way that the neurons get from the deep periventricular germinal matrix areas out to the cortex is by using things called radial glial fibers. And they are "glial" or supporting cells that have basically one foot on the ventricle wall and one foot on the cortex.
>
> And when it's time for a neuron to migrate, when it perceives that it's divided enough and it's time for it to grow, it basically attaches itself to a radial glial fiber and walks along it to get to where it has to go. Obviously if there are obstacles put in the path of the radial glial fiber such as dead tissue, problems with blood flow, problems with energy metabolism, any of those are going to either break the radial glial fiber, make the neuron fall off the radial glial fiber, make it go to the wrong place, et cetera.

---

[15]Existing during gestation.

[16]Small head.

(Tr. 128.)

She concluded by stating:

> I think that all the placental abnormalities are related to the chronic inflammatory process. All of the size issues, all of the tissue depth injury issues are related to the chronic villus inflammation.
>
> And there are two reasons why you can get that. Either a virus or maternal rejection. Because of the destructive nature of this process, I would lean towards a virus. However this – whatever the ideology, this is an extremely destructive process that would be for me a sufficient explanation for what I see.
>
> Q. And the cause of the insult occurred early in gestation?
>
> A. It has to because the placenta does not necessarily shrink although as its blood vessels become damaged it may not get heavy at a faster rate. But basically for a placenta to be arrested at this size the damage had to have hit branches early so that all of the daughter and granddaughter branches didn't develop so you'd end up with a placenta that was this size.

(Tr. 129.)

On cross-examination, Dr. Salafia stated that she could only speak to what happened until the placenta left the body. Hence, she had no opinions about a possible neonatal herpes infection. (Tr. 131-32.) She also responded to questions regarding Dr. Ophoven's statement that the weight of 114 grams, as recorded by Dr. Grotte, was likely a mistake:

> On the one hand not seriously because that's a relatively – that something that is – you might say 314 grams or 414 and make a mistake but basically I looked at this. And first of all the umbilical cord was what I would expect for a placenta that was about that size. So those two dimensions really matched very well.
>
> And then the placenta is extensively damaged so I – frankly especially when she said she proofread it, I felt that this was consistent. This is a strikingly abnormal placenta by virtue of the microscopic change as well.
>
> Q. Have you ever seen a baby delivered 35 to 38 weeks with a 90-gram placenta?
>
> A. On rare occasion. Most of the time they've been stillborn.

> Q. You've never seen a live baby with a placenta that size at 35 to 38 weeks, have you?
>
> A. I don't know whether I can say that I've never seen it. But it would be uncommon and certainly the majority of children who have that small a placenta don't have areas that are able to keep them alive.

(Tr. 135-36.)

**3. James Barkovich, M.D.**

Dr. Barkovich is a nationally-known pediatric neuroradiologist. Dr. Barkovich examined Quinten Zink's head MRI of January 22, 2001, and CT of July 13, 1998. Dr. Barkovich observed multiple areas of abnormal cerebral cortex in the brain. Specifically, in both frontal lobes, and the left occipital lobe. (Tr. 21.) He referred to this abnormality as polymicrogyria,[17] and explained it as follows:

> Well, it's an abnormality – it's an abnormality of cortical structure that as near as we can tell from both human and animal evidence occurs during the phase, late part of migration of the neurons from the germinal matrix to the cortex and during the early phase of organization.
>
> So that would be basically between about 16 and 20, maybe as late as 22 gestational weeks.
>
> Q. Does polymicrogyria or cortical dysplasia ever occur after a termed delivery? Is it a post-natal abnormality?
>
> A. No. Polymicrogyria is an early to mid second trimester – is the result of an early to mid second trimester injury.
>
> Q. It can't be caused by herpes acquired after the term delivery or any other infection?
>
> A. It certainly has never been described.

---

[17]Polymicrogyria is a condition in which gyri and sulci (the folds and bumps of the cortex) are too numerous and shallow. (Tr. 8, 25-31.)

(Tr. 22.)

Dr. Barkovich stated that the most likely cause of the polymicrogyria was a viral infection during the beginning to middle of the second trimester. (Tr. 41.) He also explained that he believed the white matter abnormalities in Quinten Zink's head films resulted from the same process that caused the polymicrogyria in the cortex, or gray matter. He explained:

> if you look at this area of scarring, it extends right up to the deep cleft of polymicrogyria. It essentially comes out of that cleft of polymicrogyria and it's unquestionably due to the same process. This scarring is a result of the process that caused the polymicrogyria. I don't think there is a question.

(Tr. 33.)

Dr. Barkovich was then asked to consider Plaintiffs' claim, that some of the abnormalities observed in the head films were caused by a herpes encephalitis infection contracted during or after delivery. He stated that what he saw on the films was not compatible with such an infection, and explained as follows:

> Well, in herpes encephalitis, in neonatal herpes encephalitis you get really profound damage to the cerebral cortex and underlying white matter that ends up with a cortex that's so thin you really can hardly see it and underlying white matter is horrendously damaged as opposed to here where we see pretty thick cortex. It's polymicrogyria but it's pretty thick. It's actually – if you measure it it would be a little thicker than normal because of the redundancy in polymicrogyria.
>
> And you have just a few little focal areas of underlying white matter abnormalility not the extensive devastating damage that you see from neonatal herpes.

(Tr. 42.)

On cross examination, Dr. Barkovich explained further that he did not believe a neonatal herpes infection caused the white matter abnormalities, or calcification in Quinten Zink's brain. He explained that such an infection generally causes calcifications in the cortex (gray matter)

rather than in the white matter, and even if such an infection did produce white matter calcifications, there would also still be gray matter calcifications. (Tr. 57.) The Court then asked Dr. Barkovich about the scope of his opinion:

> THE COURT: The question is not whether you agree or disagree with plaintiff's experts. The question for the Court today is whether there is any reliable medical or scientific literature which would support the conclusion that the white matter damage that you see in Quinten Zink's head films was caused by neonatal encephalitis?
>
> Well, I find that a difficult question to answer because of all the other overwhelming abnormalities in this child. And I think that all of the white matter abnormalities in this child can be explained by whatever caused the polymicrogyria.
>
> Now, can I with 100 percent confidence just on the basis of the radiographs rule out that a component of the white matter damage might have been caused by something else? I don't think I can with absolute confidence rule that out especially since I don't know. And from reading all of the statements of the experts I can't figure out if this child really did have herpes encephalitis.
>
> White matter damage is basically white matter damage. And white matter can result in calcification. And there are no labels on these scans to say that, you know, I was caused by the mid second – mid to early second trimester injury and another one saying that I was caused at birth and I don't know how to differentiate them.
>
> So if someone to were to prove definitively that this child did have neonatal herpes encephalitis, I would be very surprised because of the lack of significant cortical damage. And in my experience and my reading of the literature the cortex is primarily affected.
>
> And to see no areas of a treaded cortex, calcified cortex, but some just punctate underlying white matter calcifications does not seem to me like it would be herpes.
>
> But I don't claim to be all-knowing by any means. And I guess it's possible. I would be very surprised.

(Tr. 59-60.)

**4. James Bale, M.D.**

Dr. Bale is a pediatric neurologist who specializes in neurologic infection. Dr. Bale testified that Quinten Zink was growth retarded at birth, and particularly microcephalic. Dr. Bale stated that the microcephaly combined with the evidence that Dr. Barkovich had noted, demonstrated that Quinten Zink's brain was already affected before birth. (Tr. 98.) He made many of the same observations that Dr. Barkovich did about the proximity of white matter and gray matter damage, and like Dr. Barkovich, stated that there was a single cause for all of them. (Tr. 100-01.) Dr. Bale also stated that Quinten Zink's brain abnormalities were not likely caused by a CNS herpes infection. He explained:

> First of all and most importantly you would not see polymicrogyria as a result of a post-natal infection. It just simply can't happen. As you heard from Dr. Barkovich this is really an event that clearly is something happening in the brain in utero before birth.
>
> And secondly are things you don't see. I've seen a fair number of children through the years with post-natal herpes encephalitis. Those infants quite characteristically have areas of brain necrosis. You heard a little bit about that this morning.
>
> Basically what that means is the brain tends to melt away in the areas of infection. And there may be calcium around those areas but characteristically next to those areas of calcium are holes within the brain.
>
> And those are holes where this virus has multiplied within brain tissue and killed brain tissue. That's one of the unique differences about herpes as opposed to CMV. CMV doesn't damage brain in the way of making it melt away. It really does what we saw here as one example.
>
> But what herpes does is it multiplies within brain tissue, kills brain tissue and kills basically all cells that it infects. And in the recovery process what the brain does is basically form areas of cystic change or fluid-filled spaces. The cystic encephalomalacia that we heard about earlier from Dr. Barkovich. And that's quite characteristic.
>
> Q. And do we see that in the films of Quinten Zink?

A. We do not.

(Tr. 99-101.)

Dr. Bale also explained why he believed Quinten Zink's motor cerebral palsy, spasticity, and cognitive delays are all consistent with the evidence of cortical dyplasia (polymicrogyria), (T. 117.), and why the location of the white matter calcifications meant that they do not likely correspond to any of Quinten Zink's symptoms:

> So as you look at this image and if you said, if the child only had white matter abnormalities alone as they are seen here, what deficits would you see? Well, because those white matter abnormalities are mostly back here you might expect abnormalities in vision or perhaps abnormalities in sensation. But probably not abnormalities in motor function and certainly not abnormalities in cognition which is way far forward.
>
> So then you step back and say, well, what else about the brain is not right? There's calcification in the –
>
> Q. The white matter abnormalities that we see in this case being posterior do not correlate with the cognitive abnormalities?
>
> A. Correct. They do not, correct.
>
> THE COURT. Or motor abnormalities?
>
> Q. Or motor abnormalities; that's correct too, yes, Your Honor.
>
> I've seen other babies, for example, that have come to me who really are quite normal and have had white matter abnormalities as extensive as this. So this alone does not explain what we see in the baby.
>
> So that's where you rely on someone like Dr. Barkovich to look at that MRI very carefully to say what else is there. And again the important thing there is this developmental brain abnormality which happened very early on in gestation that is widespread. That is here, both sides and frontally both sides. Again in all precise areas to account for difficulties in cognition, difficulties in motor function as we hear about in this child.

(Tr. 118-19.)

**D. Discussion.**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Rule provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the from of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods of reliability to the facts of the case.

"Rule 702 reflects an attempt to liberalize the rule governing the admission of testimony." Lauzon v. Senco Products, Inc., 27 F.3d 681, 686 (8th Cir. 2001) quoting Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999). "Rule 702 is one of admissibility rather than exclusion." Arcoren v. U.S., 929 F.2d 1235, 1239 (8th Cir. 1991).

> The Supreme Court in *Daubert* makes it plain that the trial court is to act as a gatekeeper in screening such testimony for relevance and reliability, that is, make an assessment whether the reasoning and methodology underlying the testimony is scientifically valid. In doing so, the court should consider, among other factors (1) whether the theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the theory has been generally accepted.

Peitzmeier v. Hennessy Indus., Inc., 97 F.3d 293, 296-97 (8th Cir. 1996) (internal citations omitted) quoting Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94 (1993). "It is clear the Court did not intend for a trial judge to automatically exclude relevant evidence if one of these conditions was not fully satisfied." Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1298 (8th Cir. 1997).

Recently, the Eighth Circuit addressed the use of a differential diagnosis for determining

cause. It explained:

> In performing a differential diagnosis, a physician begins by "ruling in" all scientifically plausible causes of the plaintiff's injury. The physician then "rules out" the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused ( or did not cause) the plaintiff's injury. *See generally Westberry v. Gislaved Gummi AB*, 178 F.3d 257 , 262-66 (4th Cir. 1999).
>
> In *Turner v. Iowa Fire Equip. Co.*, we held that "a medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*. 229 F.3d 1202, 1208 (8th Cir. 2000). Because a differential diagnosis is presumptively admissible, *see id.*, a district court may exercise its gatekeeping function to exclude only those differential diagnoses that are scientifically invalid.

Glastetter v. Novartis Pharmaceuticals Corp., 252 F.3d 986, 989 (8th Cir. 2001). Courts have since observed, however, that,

> Both of these steps must be based on sufficient and reliable data for the methodology as a whole to be reliable. *See* Fed. R. Evid. 702; *Glastetter*, 252 F.3d at 989. Thus, if the 'ruling in' step is bad or if an extrapolation from the existing data is particularly questionable or involves too great an analytical leap (or several such leaps), the whole opinion is questionable. *See Advisory Committee Notes to 2000 Amendments to Rule 702* ("any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible").

Caraker v. Sandoz Pharmaceuticals Corp., 172 F.Supp.2d 1046, 1048 (S.D. Ill. 2001).

Defendant states that Plaintiffs have failed to provide admissible expert testimony to support the theory that Quinten Zink's injuries were caused by HSV-2. Defendant maintains that Plaintiffs' expert testimony is "based upon neither sufficient medical or scientific evidence nor logical reasoning from the available medical and scientific evidence in this case."

Defendant explains that under Daubert and its progeny of cases, as well as Federal Rule of Evidence 702, expert testimony is only admissible if: (1) the expert is competent and qualified to testify regarding the matters the expert intends to address; (2) the evidentiary basis and reasoning methodology by which the expert reaches his or her conclusions is sufficiently reliable;

and (3) the expert, through scientific, technical or specialized expertise, provides testimony that will assist the trier of fact in understanding the evidence or determining a fact in issue.

Defendant asserts generally that Drs. Narayan, Pollei, and Villar may not even qualify under the first element. However, he devotes most of his argument to the remaining two elements. Defendant claims that:

> Plaintiffs' hypotheses that (1) Quinten had a subtle or silent CNS or brain involvement in the neonatal period (although he did not display either clinical signs or symptoms, or confirming cerebral spinal fluid findings of neonatal CNS herpes/encephalitis) or, alternatively, that (2) infants with neonatal cutaneous herpes may somehow develop CNS herpes/encephalitis as a consequence of subsequent recurrent cutaneous outbreaks, have not been validated, and thus have not attained general acceptance within the scientific and medical community.

Defendant also states that there is an insufficient connection between Plaintiffs' experts' opinions and the scientific or medical evidence in this case.

Defendant explains that a differential diagnosis does not unequivocally prove a specific cause, and can not establish general causation. Therefore, some differential diagnoses may not be scientifically or medically valid, and must be excluded under Daubert. Relying on the Advisory Committee's Note to the 2000 Amendment to Rule 702, Defendant stresses that if, in the "ruling in" stage, there is too great an analytical leap from the existing facts, then the whole opinion is deemed questionable. Defendant concludes that Plaintiffs improperly ruled in CNS herpes as the cause of Quinten Zink's injuries, because there was no evidence in this case that Quinten Zink had CNS herpes either in the neonatal period or after. Defendant relies on the statements of both Drs. Prober and Kimberlin to explain that there are particular signs and symptoms of CNS involvement, and that Plaintiffs have failed to demonstrate that there were any

such signs and symptoms in this case.

Further, Defendant states that Plaintiffs can not rely on the subtle or silent CNS or brain involvement hypothesis that was the subject of the study that was written up in the 1991 New England Medical Journal article. First, Defendant explains, Drs. Prober and Kimberlin have both stated that this hypothesis remains unproven, "and determination of its validity must await the results of the current study underway." And second, Quinten Zink lacks the "defining factor" of the collaborative study, that is, the three or more recurrences of cutaneous herpes in the first six months.

In addition, Defendant notes that Dr. Prober has stated that there is no medical evidence that a cutaneous herpes virus can recur as CNS herpes. Drs. Prober and Kimberlin refer to this hypothesis as "implausible" and "improbable." Therefore, Defendant maintains that this hypothesis also can not be the basis for a scientifically valid ruling in of CNS herpes as the cause of any of Quinten Zink's injuries.

Defendant then asserts that Plaintiffs' experts did not validly rule out the in utero infection as the cause of Quinten Zink's brain abnormalities. Dr. Salafia's testimony that the placenta had extremely large amounts of necrotic tissue and villitis indicate that there was a significant decrease in oxygen and nutrients passed to Quinten Zink in utero, and explains his IUGR and microcephaly at birth. Hence it was a more likely cause of the brain abnormalities as well.

Drs. Barkovich and Bale, according to Defendant, further demonstrated that an in utero infection could not have been validly ruled out as the cause of the brain abnormalities and resulting neurologic deficits. Dr. Barkovich, in particular, testified that the polymicrogyria

would have occurred between 16 and 22 weeks of gestation, and that it could not occur postnatally from any cause, including neonatal CNS herpes. Moreover, Dr. Barkovich stated that the white matter scarring observed in Quinten Zink's head films is seen in 25% of patients with polymicrogyria. Further, both Drs. Barkovich and Bale pointed out that the white matter necrosis extends right up to, and comes out of the deep sulcus of the right parietal lobe, thus demonstrating that both the white matter abnormalities and the polymicrogyria resulted from the same cause. Both doctors also stated that CNS herpes encephalitis produces much more severe white matter damage than the limited damage in this case. Moreover, CNS herpes encephalitis should produce calcifications of the cortex (gray matter), but usually does not produce calcifications of the white matter. Finally, Dr. Bale stated that polymicrogyria is a typical result of an in utero CMV infection. And further, that IUGR is seen in 40% of congenital CMV cases.

And finally, Defendant notes that when Dr. Shanks, Quinten Zink's treating pediatric neuroradiologist, was asked to assume as accurate Dr. Barkovich's interpretation of the head MRI performed on January 22, 2001, he stated that the extent and location of the polymicrogyria and deep sulcus can explain all of Quinten Zink's motor deficits and cognitive deficits. Therefore, Plaintiffs' experts failed to perform a scientifically reliable differential diagnosis, and their testimony should be excluded pursuant to Daubert.

Plaintiffs maintain that their experts' testimony is admissible under Daubert. Plaintiffs' theory is that Quinten Zink has suffered two separate brain injuries. The first is a neuronal migration injury which occurred in utero, and hence could not have resulted from the birthing process. The second injury that Plaintiffs allege, is an encephalitic injury which was caused by the virus that was transmitted to Quinten Zink during birth. It was this injury, Plaintiffs explain,

that caused multiple punctate calcifications and periventricular leukomalacia.

Plaintiffs propose to use Drs. Ophoven, Villars, and Pollei to address the basis for the conclusion that the neonatal herpes infection inflicted this encephalitic injury. They argue that these doctors reached their conclusions by means of differential diagnoses. And cases such as Glastetter, establish that a differential diagnosis is a presumptively valid method under Daubert. Moreover, Plaintiffs state that the present case can be distinguished from the facts of cases such as Glastetter. In those cases, expert causation testimony was excluded because there was not reliable scientific evidence that the medication involved could cause the plaintiff's injury at all. Unlike Glastetter, Plaintiffs explain, in this case there is evidence of both general causation and specific causation. That is to say, there is scientifically valid evidence both that CNS herpes can cause brain damage generally, and that it did so in the present case.

Plaintiffs assert that none of the testimony presented by Defendant at the Daubert hearing addressed the methodology of Plaintiffs' experts. Plaintiffs further stress that "it is irrelevant to this motion that they [Defendant's experts] disagree with Plaintiff's experts' ultimate conclusion in this particular case." Specifically, Plaintiffs state that none of Defendant's witnesses denied the "medical fact that a neonatal herpes infection is a competent producing cause of the brain injury evident in this case." Plaintiffs note that both Drs. Prober and Bale stated that HSV-2 is a known encephalitic agent, and, thus, can cause brain injury in children. In addition, Plaintiffs note that Dr. Prober, when referencing the 1991 New England Journal article, stated that a child can have the virus enter the cerebral spinal fluid and not exhibit frank symptoms of encephalitis. Plaintiffs then explain that it is uncontested that Quinten Zink became infected as a result of delivery, and note that Quinten Zink has since had cutaneous recurrences of skin involvement.

Plaintiffs then summarize:

> Defendant argues, among other things, that the negative PCR test on day eight of acyclovir therapy proves that there was no CNS involvement. However, their own experts admit that the intervening acyclovir treatment renders the test unreliable in ruling out the presence of the virus at an earlier point in treatment. Thus Plaintiff's experts view that the negative PCR test does not rule out CNS herpes has scientific support by admission of defendant's testimony.

Plaintiffs also state that Dr. Bale never attempted to demonstrate where the analyses of Drs. Narayan and Villars were disproved by scientific principle. In addition, Defendant's experts made no attempt to explain the "grossly normal" ultrasound study done in September before delivery. Plaintiffs explain that "although the negative ultrasound is not certain evidence on the point, it does reasonably contribute to the judgment that the calcifications were not present at that time and were not therefore, the consequence of an early gestation infection."

Defendant's experts, according to Plaintiffs, merely presented their opinions in an effort to bolster their own credibility. Plaintiffs explain that "credibility assessments are not part of the Daubert analysis and must be left to the jury." Plaintiffs stress that Dr. Salafia's opinion that the condition of the placenta confirmed that there were abnormal developments during the pregnancy, does not detract "from the conclusion that the punctate calcifications and periventricular leukomalacia were caused by the neonatal herpes infection." Plaintiffs note that Dr. Salafia herself stated that her assessment does not rule out neonatal herpes CNS infection. Dr. Salafia's disagreement with Dr. Ophoven as to the accuracy of the recorded placental weight involves "matters over which experts may under the Daubert doctrine express disagreement without fear of exclusion."

Plaintiffs summarize their conclusion that Defendant's motion should be denied, as

follows:

> The point is that the origin of Quinten's calcifications and periventricular changes is subject to scientific debate and is not subject to a certain answer. Resolving the debate, however, goes to the weight of the evidence and is within the purview of the jury to decide, not the Court. Resolution of this debate is irrelevant to the issue now before this Court.

The Court grants Defendant's motion. Daubert is unquestionably a liberal standard, and Rule 702 is a rule of admissibility rather than exclusion. Nevertheless, Daubert and the cases that have followed it still emphasize that the trial court, in its gatekeeping capacity, must maintain certain standards for the admissibility of expert testimony. See e.g. Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1081 (8th Cir. 1999) citing Daubert 509 U.S. at 589. And in this case, Plaintiffs' experts have not met that standard.

Plaintiffs' experts rely on differential diagnoses to come to their conclusions. Hence, the Court will analyze their opinions under the frame work of "ruling in" and "ruling out" potential causes, as the Eighth Circuit explained in Glastetter.

**A. Ruling in CNS Herpes as a Possible Cause of Quinten Zink's Injuries.**

Plaintiffs' reasoning, in its most general form, is that herpes encephalitis can cause neurologic morbidity. Quinten Zink suffers from neurologic morbidity, and was infected with HSV-2 at birth. Therefore, it is valid to rule in the infection at birth as a possible cause of the neurologic morbidity.

Plaintiffs do not make the argument that Quinten Zink's cutaneous herpes infection produced the encephalitis that caused the neurologic morbidity. Instead, they maintain that the delivery process resulted in a CNS infection. Whether this infection occurred in the neonatal period or sometime after, Plaintiffs' argument still is based on the premise that Quinten Zink had

CNS herpes.

The Eighth Circuit, in Glastetter, clearly stated that a differential diagnosis is a presumptively admissible method. 252 F.3d at 989. But the Eighth Circuit has also repeatedly quoted the Supreme Court's warning that,

> conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Moreover, the Eighth Circuit has also cautioned that "[e]stablishing that the risk of causation 'is not zero' falls woefully short of the degree of proof required by *Daubert* and its progeny." National Bank of Commerce v. Associated Milk Producers, Inc., 191 F.3d 858, 860-61 (8th Cir. 1999). And finally, it has provided the following warning against faulty causal reasoning:

> Instead of reasoning from known facts to reach a conclusion, the experts here reasoned from an end result in order to hypothesize what needed to be known but what was not.
>
> While it may be that this sort of reasoning could pass muster in some cases where the obvious result explains the etiology (for example, where a fractured bone accompanied by bruised outer skin and flesh demonstrate that some type of physical contact caused the injury) such reasoning cannot apply here where several possible causes could have produced one effect.

Sorenson v. Shaklee Corp., 31 F.3d 638, 649 (8th Cir. 1994).

Therefore, it will not be enough to simply argue that Quinten Zink's brain injuries might be consistent with a CNS infection, and so, it is valid to rule in CNS as a possible cause. The

brain injuries in this case are not such obvious results that it is possible to posit their cause directly from them. Instead, the Court must determine whether, aside from the brain injuries themselves, there is any evidence in this case that will support the premise that Quinten Zink had CNS herpes.

Unfortunately for Plaintiffs, there was no such evidence produced. With respect to the hypothesis that Quinten Zink's initial cutaneous infection recurred as a CNS infection, the most that was said by any expert,[18] including Plaintiffs' own Dr. Kimberlin, was that this theory was "implausible." None of Plaintiffs' experts explain why this process would actually take place, and none of them explained what evidence in this case, or in any case, would be useful in demonstrating that it did. Therefore, the most that can be said for this theory is that no expert stated that it is inherently impossible. But that is not sufficient to rule it in, even under the liberal Daubert standard. See National Bank of Commerce,191 F.3d at 860-61.

Plaintiffs' second theory for ruling in CNS herpes as a cause of the brain injuries, is that Quinten Zink had a CNS herpes infection that was transferred to him at birth. This hypothesis is clearly possible in theory. Moreover, Dr. Prober, stated that is a well accepted fact in the scientific community that CNS herpes can cause neurologic morbidity.

This confirmation, however, merely bolsters Plaintiffs' general premise of causation. Under the Eighth Circuit's interpretation of Daubert, though, there must also be sufficient evidence to allow Plaintiffs to make a threshold showing that in this case Quinten Zink actually

[18]By considering Defendant's experts as well as Plaintiffs' at this stage of "ruling in" possible causes, the Court is not attempting determine whose conclusions are more appealing, nor is it attempting to make a credibility judgment. Rather, it is considering all the available authorities simply to determine what types of evidence might be consistent with Plaintiffs' theory of causation, and thus would support ruling in CNS herpes as a potential cause.

had CNS herpes. The Court finds that there is no such evidence. None of Plaintiffs' own experts' reports[19] point to anything other than the brain injury itself, and the fact that Quinten Zink had an HSV-2 infection. None of these experts discussed any corroborative evidence. And while Plaintiffs' attorneys and experts point to certain shortcomings in Defendant's theories of causation, that alone is not sufficient to rule in Plaintiffs' theory. See Glastetter v. Novartis Pharmaceuticals Corp., 107 F.Supp.2d 1015, 1044 (E.D. Mo. 2000), aff'd 252 F.3d 986 (2001); Brumbaugh v. Sandoz Pharmaceutical Corp., 77 F.Supp.2d 1153, 1156 (D. Mont. 1999); Siharath v. Sandoz Pharmaceuticals Corp., 131 F.Supp.2d 1347, 1358 (N.D. Ga. 2001) (all holding that criticizing opposing party's theory or evidence does not satisfy plaintiff's burden of proof).

Drs. Prober and Kimberlin offered consistent lists of signs and symptoms that accompany a CNS infection. As detailed above, they both recognized that seizures, fevers, and lethargy were all recognized symptoms. Moreover, high white blood cell counts, and protein levels are signs of a CNS infection and the resulting destruction to the brain. And finally, both explained that PCR testing can often reveal the presence of herpes DNA in the cerebral spinal fluid.

Plaintiffs concede that none of these signs or symptoms were present in this case. And Plaintiffs do not suggest that there are other signs or symptoms of CNS herpes that were not mentioned by Defendant's expert, but which Quinten Zink did display. Instead, Plaintiffs focus

---

[19]If Plaintiffs had made their experts available for the Daubert hearing it would have been possible for the Court to inquire of them what evidence supported their conclusions. Plaintiffs, nevertheless, chose only to submit their opinions through affidavits. At the completion of the hearing, the Court announced to Plaintiffs that it was concerned about the foundation for their causation arguments, and proposed to extend the hearing in order to allow their experts to testify. Plaintiffs, however, informed the Court that their experts had nothing further to add, beyond what was contained in their reports.

on the point that Quinten Zink's acyclovir treatment could have interfered with the PCR testing and produced a negative result even if he had the infection. Dr. Prober responded that even with acyclovir treatment, the accuracy of PCR testing may be as high as 80%. Dr. Prober's response, however, does not matter in this instance. All Plaintiffs have accomplished by questioning the accuracy of the PCR testing, is to criticize one piece of evidence that appears unfavorable toward them. They have not produced any positive evidence to demonstrate the presence of CNS herpes. The most that Dr. Narayan has said is that "HSV encephalitis could not be completely ruled out." And the most that Dr. Villar stated is that "the patient need not exhibit frank symptoms." These arguments do not help them to carry their preliminary evidentiary burden.[20]

The present case can be contrasted to Hose v. Chicago Northwestern Transp. Co., 70 F.3d 968 (8th Cir. 1995). In Hose, a plaintiff offered evidence that he suffered from sleep disorders to demonstrate that he had suffered injury from exposure to a toxic substance. Id. at 974. The court admitted this evidence over the defendant's objection that "there is no clearcut distinction at this point of the type of sleep disorders from toxic and nontoxic encephalopathy." Id. The court explained that the defendant was free to argue to the jury that the testimony should carry little weight, but it was not error to admit it. Id.

In the present case, Plaintiffs are not attempting to present evidence that could conceivably support multiple conclusions. Plaintiffs are merely criticizing Defendant's evidence while supplying none of their own. Consequently, they can not successfully argue that by

[20]The Court recognizes that in the case of the PCR test, Plaintiffs may be striving to demonstrate that there could have been positive evidence if not for problems with the testing condition. But the unreliability of the test does not suggest that Quinten Zink did in fact have CNS herpes.

permitting them to present their theory of causation to the jury, the Court would merely be allowing the jury to determine the relative weight of the evidence. Glastetter and its progeny establish that a differential diagnosis will only pass Daubert if there is reliable evidence that supports ruling in the cause that plaintiff urges.

Plaintiffs' other argument for ruling in CNS herpes as the cause of injury is based on the collaborative study and accompanying 1991 New England Journal article. Plaintiffs argue that although Quinten Zink demonstrated none of the signs or symptoms of a CNS infection, the collaborative study demonstrates that it is still possible that he had CNS herpes. This argument initially appears appealing, because it seems to require no evidence. Nevertheless, there are numerous shortcomings to it. First, while Plaintiffs stress that Quinten Zink had cutaneous recurrences, they neglect to mention that only one of these occurred within the first six months of life. Both Drs. Prober and Kimberlin emphasized that the four children who appeared to have subtle (or undetected) brain involvement all experienced three or more cutaneous recurrences within the first six months of life. Moreover, Dr. Prober referred to the timing and frequency of these recurrences as the "defining factor." Hence, Quinten Zink lacks a significant similarity to the babies with whom Plaintiff draws a connection.[21]

Furthermore, subsequent testing indicated that at least one of the babies who had neurologic deficits had a positive PCR. Because of problems with the preservation of samples, the question remains unanswered whether all of the children who experienced neurologic deficits

[21]The Court also notes that this study involved babies who at the time were believed to have only SEM herpes. Therefore, it is exceedingly unlikely that any of these babies demonstrated IUGR and microcephaly, as did Quinten Zink. Hence, the connection between him and the subjects of this study seems even more problematic.

would have had positive PCRs. Hence, it is unclear whether Quinten Zink's negative PCR renders him even less similar. Further, according to Drs. Prober and Kimberlin, the hypothesis of this study remains unproven. Therefore, even if he had similar recurrences, the study itself would likely not pass Daubert, and Plaintiffs would not be able to base their theory of causation upon it.

In short, no evidence has been presented in this case other than Quinten Zink's brain injuries and his cutaneous herpes infection. Plaintiffs' experts have offered no evidence to demonstrate the presence of CNS herpes. Consequently, they have failed to validly rule in CNS herpes as a potential cause of the injuries. Plaintiffs' counsel argues that unlike in Glastetter, the theory of the present case that herpes can cause brain damage is accepted. That alone, however, is not enough.

An accepted general theory of causation does not automatically produce an admissible differential diagnosis. Rule 702 requires both that the testimony is the product of reliable principles and methods, and that the witness has applied the principles and methods of reliability to the facts of the case. The general connection between CNS herpes and resulting brain injuries may be a reliable principle. But without some actual evidence of the presence of CNS herpes, Plaintiffs' experts can not reasonably apply that principle to the facts of this case. The Eighth Circuit has repeatedly cited General Elec. Co for the principle that methodology alone will not make an opinion admissible when "there is simply too great an analytical gap between the data and the opinion proffered." 522 U.S. at146. As a result, the Court grants Defendant's motion.

**B. Ruling out the Least Plausible Causes.**

"[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived

by the scientific method. Proposed testimony must be supported by appropriate validation--i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590.

> A medical expert's opinion causation conclusion should not be excluded simply because he or she has failed to rule out every possible alternative cause of a plaintiff's illness. As Professor Capra, Reporter to the Advisory Committee on the Federal Rules of Evidence has put it:
>
> > [T]o require the experts to rule out categorically all other possible causes for an injury would mean that few experts would ever be able to testify. . . .
> > . . . Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted.
>
> Daniel J. Capra, *The Daubert Puzzle*, 32 Ga. L.Rev. 699, 728 (1998).

Heller v. Shaw Indus., Inc., 167 F.3d 146, 156 (3rd Cir. 1999)

Because Plaintiffs failed to reliably rule in CNS herpes as a plausible cause, it is a moot point whether their experts validly ruled other plausible causes in performing their differential diagnoses. Nevertheless, the Court will also consider this second issue. Under the above authority, Plaintiffs need not have excluded every possible cause. However, they require good grounds for ruling out obvious alternative causes.

**1. Dr. Ophoven.**

Dr. Ophoven lacks good grounds for excluding an intrauterine viral infection as the cause of Quinten Zink's IUGR. She offers no supporting evidence for her statement that there is nothing pathognomonic of an intrauterine viral infection. According to both Dr. Grotte's deposition testimony, and Dr. Salafia an infarction or necrotic tissue covered large amounts of the maternal surface of the placenta. Dr. Salafia stated further, that necrosis as well as the

evident villitis were entirely consistent with an intrauterine viral infection. Dr. Ophoven certainly does not have to agree with Dr. Salafia. Nor does she have to definitively disprove Dr. Salafia in order to offer her own opinion. However, the evidence that Dr. Salafia observed was significant enough that Dr. Ophoven should have provided some grounds for her statement there was nothing pathognomonic of an intrauterine viral infection.

The only grounds Dr. Ophoven provides are that she believes the weight of the placenta was an error, because it is not "consistent with Dr. Grotte's assessment that this was a mature placenta and further is not consistent with the reported gross dimensions of the placenta."

Dr. Grotte, however, explained at her deposition that the low weight was not an error and resulted from the infarction and its corresponding lack of blood. Therefore, the grounds Dr. Ophoven did supply for her exclusion of intrauterine viral infection, are without basis.

**2. Dr. Pollei.**

Dr. Pollei was told to assume Dr. Ophoven's conclusion that there is nothing pathognomonic of an in utero infection on the placenta. To the extent that his opinion relies on that conclusion, it is without basis. Further, Dr. Pollei was told to assume Quinten Zink never "exhibited the symptoms of an in utero CMV infection which would include hyperbilirubinemia, petechial rash splenomegaly and thrombocytopenia." However, Dr. Salafia repeatedly stated that the condition of the placenta was consistent with an in utero viral infection. Moreover, Dr. Barkovich stated that Quinten Zink's polymicrogyria can be caused by an in utero viral infection. Clearly, Quinten Zink exhibited symptoms that are consistent with a CMV infection.[22] Because

---

[22]It is entirely irrelevant what any of the experts conclude from these symptoms. The symptoms are facts of Quinten Zink's medical record. By assuming there were no such symptoms, Dr. Pollei, in effect, was offering a differential diagnosis for an individual with

Dr. Pollei was instructed to assume otherwise, it is impossible to determine whether he actually had good grounds for excluding an in utero infection as potential cause.

In addition, Dr. Pollei's reliance on the negative CMV antigenemia test from October 10, 1997 is also problematic. Dr. Bale testified that the correct timing and type of CMV test must be performed to produce accurate results. Dr. Bale explained that either a blood test performed at approximately 10 weeks, or a urine culture on October 10 would have produced more accurate results. However, the blood test that was performed was the wrong one.

When Dr. Pollei states that the medical evidence of this case does not support the suspicion that a single in utero infection caused the schizencephaly and the encephalitis, he does not state what evidence he is considering. It is not clear whether this statement is based on the faulty grounds listed above, or more reliable facts. As a result, the Court can not accept his conclusion as a valid differential diagnosis.

**3. Dr. Villar.**

Dr. Villar, like Dr. Pollei, mentions in his report that "there is no evidence in the medical records that Quinten was infected with HSV-2 or any other virus in utero." He provides no explanation for why the condition of the placenta, IUGR and microcephaly, and the polymicrogyria are not evidence of a virus in utero. As the Court stated concerning Drs. Ophoven and Pollei, Dr. Villar does not have to reach the same conclusion as Defendant's experts. Nor does he have to definitively disprove Defendant's theory. But because the evidence of an in utero infection is significant, Dr. Villar does need to offer good grounds for excluding it. And he has not done so.

---

different characteristics from Quinten Zink.

C. **Summary Judgment.**

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "On summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. v. Zenith Radio, 475 U.S. 574, 587 (1986) quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

> The nonmoving party may not, however, "rest on mere allegations or denials" but must demonstrate on the record the existence of specific facts which create a genuine issue for trial. Fed R. Civ. P. 56(e). Such an issue exists and summary judgment must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party.

Krenik v. County of Le Sueur, 47 F.3d 953, 957 quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"To establish a prima facie case of medical malpractice, a plaintiff must introduce expert testimony demonstrating (1) the standard of care recognized by the medical community as applicable to the particular defendant, (2) that the defendant departed from that standard, and (3) that the defendant's departure was a direct cause of the plaintiff's injuries." Fabio v. Bellomo, 504 N.W.2d 758, 762 (Minn. 1993) citing Plutshack v. University of Minnesota Hospitals, 316 N.W.2d 1, 5 (Minn. 1982).

The court grants Defendant's motion for summary judgment with respect to Plaintiff's neurologic injuries. Plaintiffs' expert testimony does not satisfy the requirements of Daubert, and, therefore, they have failed to make a prima facie case of medical malpractice regarding this issue.

**THEREFORE, IT IS HEREBY ORDERED that:**

Defendant's Motion in Limine to Exclude Expert Testimony and for Partial Summary Judgment

(Doc. No. 29) is **GRANTED**.

Dated: January 22, 2002

SUSAN RICHARD NELSON
United States Magistrate Judge